# EXHIBIT "C"



**CORPORATION SERVICE COMPANY**

null / ALL
**Transmittal Number: 13378499**
**Date Processed: 01/21/2015**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Robert B. McIntosh<br>Rock-Tenn Company<br>504 Thrasher Street<br>Norcross, GA 30071 |
| **Copy of transmittal only provided to:** | Sandra Garrison<br>Carol Francis<br>Sheila Colbert<br>Patty Bryant |

| | |
|---|---|
| **Entity:** | RockTenn CP, LLC<br>Entity ID Number 2972433 |
| **Entity Served:** | RockTenn CP, LLC |
| **Title of Action:** | Southern Coal Sales Corporation vs. Rocktenn CP, LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Harlan County Circuit Court, Kentucky |
| **Case/Reference No:** | 15-CI-00016 |
| **Jurisdiction Served:** | Kentucky |
| **Date Served on CSC:** | 01/20/2015 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Johnnie L. Turner<br>606-573-9000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

| AOC-S-105    Sum Code: CI | | Case Number **15-CI-00016** |
|---|---|---|
| Rev. 7-99 |  | Court   CI |
| **Commonwealth of Kentucky**<br>**Court of Justice**<br>**CR 4.02; Cr Official Form 1** | **Civil Summons** | County   HARLAN |

*Plaintiff,* SOUTHERN COAL SALES CORPORATION,     VS. ROCKTENN CP, LLC,, *Defendant*

> ROCKTENN CP, LLC,
> AGENT: CORPORATION SERVICE CO
> 421 W MAIN STREET
> FRANKFORT              KY     40601

**The Commonwealth of Kentucky to the above-named Defendant(s):**

You are hereby notified that a legal action has been filed against you in this court demanding relief as shown on the document delivered to you with summons.  Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days following the day this paper is delivered to you, judgement by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding such relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this summons.

Circuit/District Clerk, WENDY FLANARY

By _____  *LP* , DC

Date: 01/12/2015

**Proof of Service**

[  ] This Summons was served by delivering a true copy and the Complaint (or other initiating document)
    To: _____

[  ] Not Served because: _____

Date: _____, 2 _____

Served by _____

CI    15-CI-00016
SOUTHERN COAL SALES CORPORATION,    VS. ROCKTENN CP, LLC,



## COMMONWEALTH OF KENTUCKY
## HARLAN CIRCUIT COURT
## CIVIL ACTION NO. 15-CI- 000l6

**SOUTHERN COAL SALES CORPORATION**         **PLAINTIFF**

**VS.**

FILED IN MY OFFICE THIS THE _12_ DAY
OF _____ 20_15_
WENDY FLANARY, CLERK
BY:_____ _1L_ D.C.

**ROCKTENN CP, LLC**                  **DEFENDANT**

## COMPLAINT

Comes now Plaintiff **Southern Coal Sales Corporation** and asserts the following allegations, causes of action, and claims for relief for its complaint against Defendant **RockTenn CP, LLC**:

### PARTIES

1. Plaintiff **Southern Coal Sales Corporation** (hereinafter also referred to as "**Southern Coal**") is and was at all times relevant a foreign corporation organized under the laws of the state of Delaware with its principal place of business at 302 South Jefferson Street–Suite 600, Roanoke Virginia, 24011.

2. Defendant **RockTenn CP, LLC** (hereinafter also referred to as "**RockTenn**") is and was at all times relevant a limited liability company organized under the laws of the state of Delaware with its principal place of

1

business at 504 Thrasher Street, Norcross, Georgia 30071. It has filed a Certificate of Authority with the Secretary of State for the Commonwealth of Kentucky and is subject to service within this state through its registered agent **Corporation Service Company d/b/a CSC-Lawyers' Incorporating Service Company, 421 W. Main Street, Frankfort, Kentucky 40601**.

## JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over Plaintiff's claims.  As set out more fully below, Southern Coal seeks to recover damages for breach of contract in excess of the minimum amount in controversy, i.e. $5,000, exclusive of interest and costs.  See KRS § 24A.120, 23A.010

4.  This Court would have *in personam* jurisdiction over all parties.  As more fully stated below, the claims arise from the parties' transaction of business within this Commonwealth.  Also, Southern Coal contracted with RockTenn to supply coal located within Kentucky.  See KRS § 454.210 (2) (a) 1, 2.

5.  This Court is a proper venue.  As more fully stated below, the Coal Sales Agreement which is the subject of this action was to be performed in Harlan County, Kentucky.  See KRS § 452.450

## STATEMENT OF FACTS

6.   On December 23, 2012, Southern Coal entered into a one year coal requirements contract with RockTenn called the "Coal Supply Agreement" which

2

was to begin January 1, 2014 as shown by the Agreement attached hereto.   See Exhibit "A."

7.   The Agreement required RockTenn to purchase from Southern Coal 100% of RockTenn's coal requirements for its Fernandina Beach, Florida paper mill. (Agreement § 4)

8.   The Agreement provided that the coal would be sold FOB loaded into rail cars at the Loading Point (Agreement § 7(a)), defined generally as the Harlan District or Big Sandy District (Agreement §1 (c)).

9.   The Agreement required RockTenn to advise Southern Coal "on or before the 15th day of each calendar month preceding scheduled Shipments [defined as "unit train" in §1(e) of the Agreement] of the number of Shipments it desires to load during the succeeding calendar month to fulfill the transaction quantity and Buyer's desired loading dates and delivery schedule." (Agreement § 7(b))

10.   The Agreement provided that schedules, including loading dates, "shall be established by the parties in accordance with Buyer's requirements . . . ." (Agreement § 7(b))

11.   The Agreement also provided: "Buyer will contract directly with the Carrier [CSX Railroad] for shipment to the Buyer's Designated Plant(s)." (Agreement § (7(a))

12. Pursuant to the Agreement, Southern Coal made a test shipment of coal to RockTenn in December 2012 from its Bardo, Kentucky load out.

13. Pursuant to the Agreement, RockTenn accepted the coal shipped from the Bardo, Kentucky load out and advised Southern Coal that it was pleased with the quality of the coal shipped.

14. Soon after accepting the coal the Defendant proceeded to breach the Agreement, specifically paragraph four (4) by not purchasing 100% of its requirements from the Plaintiff, Southern Coal. The Defendant, by and through its representative Jodie Wright, emailed the Plaintiff on January 2, 2013 unilaterally advised Southern Coal that it was not going to fulfill its Agreement with Southern Coal and planned to fulfill by purchasing coal from Duke Energy, who was coal supplier prior to the Agreement. See Exhibit "B"

15. Instead of the Defendant purchasing two (2) train shipments each month as required to fulfill its commitment, it purchased 100 percent of its Agreement, RockTenn advised Southern Coal that in January 2013, it would purchase only one train shipment from it, that being approximately one-half of its requirements for its Florida plant.

16. RockTenn did not furnish Southern Coal any consideration for its wrongful, unilateral modification of the Agreement.

17.  Southern Coal made a shipment of coal to RockTenn in late January 2013, which shipment was delivered in early February 2013.

18.  RockTenn, as operated by the Agreement, did obtain rail permits and cars from the CSX Railroad for the January shipment.

19.  In compliance with the Agreement, the quality of the January shipment was in accordance with the Agreement's specifications, and RockTenn accepted the coal.

20.  On February 4, 2013, RockTenn advised Southern Coal of a problem with the January shipment.  See Exhibit "C."  The Plaintiff determined that it was an insignificant problem, which was the size of the coal, not the quality of the coal, as set out in specifications.

21.  Plaintiff did respond to the Defendant's February 4, 2013 email, by email dated February 5, 2013, by Plaintiff's representative Steve Sarver of Southern Coal who advised RockTenn that he personally went to the mine and investigated the alleged problem. See Exhibit "D"

22.  Mr. Sarver confirmed in his February 5, 2013 email (Exhibit "D") to RockTenn that the problem was resolved; specifically, he insured that the parameters of the coal crusher were adjusted to correct the sizing so that the insignificant problem would not occur again.

23.    For the February shipment of coal, in breach of the Agreement, RockTenn did not advise Southern Coal "on or before the 15th day of" January "of . . . [its] desired loading dates and delivery schedule" per the requirements of § 7(b) of the Agreement.

24.  RockTenn never advised Southern Coal of any loading date or delivery schedule for February, 2014.

25.  Despite RockTenn's failure to afford Southern Coal the requisite notice under the Agreement of RockTenn's desired loading and delivery dates, in February, Southern Coal was ready to make another shipment to RockTenn.

26.  Southern Coal intended to ship any coal ordered in February from the Southern Coal' Jones Fork loading point but due to a mechanical problem beyond Southern Coal's and Steve Sarver's reasonable control, Southern Coal advised RockTenn that Southern Coal would fulfill any order from the nearby Balkan load out. See Exhibit "E".

27.  The Balkan load out is also serviced by the CSX Railroad, and loading from the Balkan load out, only a short distance from the Bardo load out, is not materially different than loading from Jones Fork or Bardo.

28.    The coal to be shipped from the Balkan load out met all the specifications of the Agreement.

6

29.    Mr. Sarver's February 14, 2013 email requested RockTenn's cooperation to allow Southern Coal to ship the coal: "Please request CSX to place the train immediately. We have the coal stockpiled to load." See Exhibit "E"

30. In violation of the terms of the Agreement, RockTenn did not respond to Mr. Sarver's February 14th email and did not cooperate in any manner to allow the second February shipment from Southern Coal.

31. RockTenn's failure to obtain the requisite railroad permits for Southern Coal to ship the coal in mid-February, was in a violation of the terms and conditions of § 7(a) of the Agreement.

32.    After failing to follow the terms of the Agreement and the e-mail request from Steve Sarver of Southern Coal and without any factual legal basis RockTenn's James Tuttle on February 22, 2013 advised Southern Coal that "RockTenn remains very concerned about Southern Coal's ongoing lack of performance." See Exhibit "F".

33. After receiving that email, Southern Coal's Steve Sarver immediately responded to RockTenn that operational problems at the Jones Fork, Kentucky site had caused delays in shipping from that site, but that Southern Coal was ready, willing, and able to ship from its nearby Bardo, Kentucky load out. See Exhibit "G".

34.   In this same e-mail, Southern Coal's Steve Sarver also notified RockTenn that Southern Coal was prepared to make a March, 2013 shipment from the Bardo load out.  See Exhibit "G".

35.   The Bardo, Jones Fork, and Balkan load outs are all serviced by the CSX Railroad, who has a rail yard in Harlan County, Kentucky.

36.   On February 23, 2013, Steve Sarver of Southern Coal wrote to RockTenn and again advised that Southern Coal could immediately load the coal at its Bardo, Kentucky site. See Exhibit "H".

37.   On February 25, 2013, RockTenn's counsel wrote to Southern Coal, wrongly claiming that Southern Coal was in breach of the Agreement and furnishing Southern Coal with an opportunity to cure the non-existent breaches pursuant to §§ 14-15 of the Agreement. See Exhibit "I".

38.   Pursuant to § 15 of the Agreement, a party that is actually in breach of the Agreement is afforded 15 days from notice to cure the breach.

39.   Southern Coal's legal counsel, Dustin Deane, responded to RockTenn's counsel that same day, February 25, 2013. See Exhibit "J"

40.   Mr. Deane's February 25, 2013 letter reiterated that Southern Coal was ready, willing, and able to ship – something RockTenn already knew – and he

8

requested that RockTenn provide the permit for the train to be shipped out of Bardo, Kentucky.

41. Mr. Deane's February 25th letter also requested RockTenn to provide its March 2013 shipping schedule, a schedule that RockTenn was contractually obligated to send ten days earlier.

42. In the next 15 days, Southern Coal provided RockTenn every assurance of its capability and readiness to perform, but its assurances were ignored.

43. Following RockTenn's wrongful February 25, 2013 letter (Exhibit "I"), RockTenn failed to cooperate with Southern Coal's attempts to perform, and failed to perform its obligations, under the Agreement.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

44. For its first cause of action, Plaintiff adopts by reference all allegations set out above as if incorporated verbatim.

45. As set out above, an actual controversy exists between the parties and this Court may make a binding declaration as to their rights and obligations under the Agreement.

46. As set out above, Plaintiff is entitled to the entry of a declaratory judgment finding as follows:

a) RockTenn's declaration that Southern Coal had breached the Agreement was posited in bad faith and constitutes a repudiation and material breach of the Agreement

b) Southern Coal fully and properly complied with the "cure" provisions of § 15 of the Agreement

c) RockTenn's refusal to acknowledge Southern Coal's full and proper compliance with § 15 of the Agreement constituted a repudiation and a material breach of the Agreement

d) As a direct or proximate result of RockTenn's failure to comply with its obligation, Southern Coal has suffered compensatory, incidental, and consequential damages and has a right to recover prejudgment interest, attorney fees, costs and all other relief allowed under the Agreement.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

47.    For its second cause of action, Plaintiff adopts by reference all allegations set out above as if incorporated verbatim.

48.   Southern Coal complied with all of its obligations under the Agreement and fulfilled all conditions required of it in good faith.

49.   RockTenn has either failed to comply with its obligations or have materially breached the specific provision of the Agreement.  This includes but is not limited to:

a)  RockTenn has refused to take deliveries of coal

b)  RockTenn has failed to cooperate in Southern Coal's performance of its obligation

c) RockTenn wrongfully declared that Southern Coal was in breach of the Agreement

d)  RockTenn has failed to purchase 100% of its coal requirements from Southern Coal as required under the Agreement

50.  RockTenn has failed to perform in accordance with the requirements set out by common law and statute.  See KRS §§ 355.2-501–355.2-515; 355.2-601–355.2-616;  Va. Code Anno. §§ 8.2-501–8.2-515, §§ 8.2-601 – 8.2-616

51.   As a direct or proximate result of RockTenn's failure to perform, Southern Coal is entitled to recover all compensatory, incidental and consequential damages it has incurred either at common law and statues.  See KRS § 355.2-703—355.2-710; Va. Code Anno. § 8.2-703—8.2-710

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff **Southern Coal Sales Corporation** prays the following:

1. That this Court assume jurisdiction over the parties and subject matter.

2. That a trial by jury be had as to all issues of fact including but not limited to any breach of the Coal Supply Agreement as well as the damages incurred.

3. That a declaratory judgment be entered finding that Southern Coal has complied with all duties and obligations set out within the Coal Sales Agreement and that RockTenn has failed to comply and materially breached that Agreement.

4. That a judgment be rendered in favor of Southern Coal against RockTenn for all compensatory, incidental and consequential damages suffered as a direct or proximate result of the latter party's failure to comply and breach of the Agreement.

5. That Plaintiff be awarded prejudgment interest on all amounts owed and damages sustained.

6. That Plaintiff recover its billable cost as well as reasonable attorneys' fees incurred.

7. That Plaintiff be awarded any and all other relief to which it may appear entitled.

JOHNNIE L. TURNER, P.S.C.
114 South First Street
P.O. Box 351
Harlan, Kentucky 40831
Telephone: 606-573-9000
Facsimile: 606-573-4404
Email: dianehill@harlanonline.net

By: _____

Johnnie L. Turner, Esq.
Counsel for Plaintiff Southern Coal
Sales Corporation

13

## Coal Supply Agreement

### (Fernandina Beach, FL)

This Coal Supply Agreement ("Agreement") is made and entered into as of Dec. 23 2012, by and between RockTenn CP, LLC ("Buyer"), a Delaware limited liability company, and

Southern Coal Sales Corporation
302 South Jefferson Street, Suite 600
Roanoke, VA 24011

### RECITALS:

Buyer is a manufacturer of paperboard and paper-based packaging, and desires to purchase coal from Seller for use at its paper manufacturing plants.

Seller is a seller of coal and represents that it has obtained all necessary authorizations and arrangements to provide to Buyer the quantity and quality of coal desired by Buyer, and desires to sell coal to Buyer.

Now, therefore, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms, provisions and conditions set forth herein, the parties hereto agree as follows:

### AGREEMENT

1. Definitions

In addition to other terms defined elsewhere in this Agreement, the following terms shall have the following definitions whenever such terms are used in this Agreement: *or and Ken Southern Coal Operation*

    a.    The "Approved Source" of the coal is Sequoia Energy, LLC operation in Harlan County, Kentucky. In the CSX rail directory the origin is listed as Bardo, Kentucky and the origin number is 43758

    b.    The "Carrier" means the CSX Railroad.

    c.    The "Loading Point" means  The Harlan District *or Big Sandy District*

    d.    The "Mill" or "Designated Plant" refers to Buyer's paper mill(s) located at Fernandina Beach, Fl.

    e.    The term "Shipment" means unit train

    f.    The term "ton" means an avoirdupois weight of 2,000 pounds.

2. Mutual Obligations

EXHIBIT
A
tabbies

Seller shall sell coal produced from the Approved Sources or purchased from other approved sources ("Other Sources," as defined below) to Buyer, and Buyer shall buy such coal from Seller, on the terms and conditions of this Agreement.

3. Term
The term of this Agreement shall be for a period of one(1) year beginning on January 1 ,2013 and ending December 31, 2013.

4. Quantity.
Subject to the terms, conditions and other provisions of this Agreement, Seller agrees to sell to Buyer, and Buyer agrees to purchase and accept from Seller, one hundred percent (100%) of the Mill's requirements for coal, estimated at 228,000 tons during the term of this Agreement. Seller understands the estimated quantity is subject to change based on Buyer's individual operating circumstances and as such Buyer shall not be obligated to purchase any specific quantity of coal herein whatsoever.

5. Source.
Coal to be delivered under this Agreement will be produced at the Approved Sources. If the producer of the coal is not Seller, then Seller warrants to Buyer that Seller and the producer(s) named in Section 1.b. above have entered into written agreements to provide, for the term of this Agreement, coal in the quantities and meeting the quality specifications as set forth herein. Under no circumstances shall Seller deliver coal from any source other than the Approved Sources without the prior written consent of Buyer.

6. Substitution of Coal. Notwithstanding the provisions of Section 5 above, Seller may, from time to time, supply coal under this Agreement from a source other than the Approved Source ("Other Source") under the following conditions:

(i) Seller shall have obtained Buyer's prior written consent to supply coal from the Other Source(s), the location and description of which shall be reflected in Attachment B.

(ii) Seller's substitution sources are from property that Seller, during the term of the Agreement, controls whether by ownership, lease or contract, and property or mining areas that Seller has previously sold or sells during the term of the Agreement.

(iii) Seller's right to substitute coal shall in no event cause the delivered (on a cents per MMBtu basis) price of substitute coal to Buyer's Mills provided for in the Agreement to increase over the delivered Approved Sources price of coal which would have resulted if such substitution had not occurred (the "Delivered Cost"). Delivered Cost shall comprise the sales price, as calculated and adjusted under the Agreement, plus transportation to the Mill(s), and includes all costs (including without limitation those associated with the transportation, delivery, storing or handling of coal prior to delivery to the Mill(s), and taxes). Delivered Cost will be determined by Buyer based on the cost of transporting the substitute coal to the Designated Plants using Buyer's transportation contracts or, if not available, market cost of transportation.

(iv) Buyer may, at its discretion and option, divert substitute coal to other destinations within the Buyer's system at no additional cost to Seller.

(v) Seller shall give Buyer at least sixty (60) days written notice prior to commencement of shipment of substitute coal Shipments. The notice will specify the seams, sources, blends, blending process, tonnage and

2

other pertinent data associated with such coal to enable Buyer to property evaluate whether the substitute coal meets the requirements of the Agreement. If Buyer is assured that Seller's coal can meet the Specifications listed in Section 11 below, Buyer may, but is not required to, require a test Shipment. Shipment of the substitute coal may begin if Buyer is satisfied, in its sole discretion, of Seller's ability to deliver coal that handles and burns satisfactorily, causes no operational problems and complies with the Specifications, and the parties agree on the Delivered Cost and transportation arrangements. If Buyer does not receive adequate assurance of Seller's ability to deliver coal which handles and burns satisfactorily and which complies with the Specifications, or if the test Shipment fails to comply with the Specifications, or if the parties do not agree on the Delivered Cost or on transportation arrangements, regular Shipments of substitute coal will not be allowed to occur.

      (vi) All substitute coal Shipments shall comply with the Specifications set forth in this Agreement, shall be capable of being handled and burned in the Mills without causing operational problems, and shall be subject to all remedies set forth in the Agreement applicable to the delivery and buying of such coal.

      (vii) Any approved coal from Other Sources shall be scheduled in coordination with Buyer so as to permit unloading in an orderly manner without interference to Buyer's or its contractors' operations at the unloading site.

## 7. Delivery and Shipment.

      (a)     The coal sold hereunder is sold FOB loaded into rail cars at the Loading Point. All coal shipped under this Agreement shall be shipped to Buyer's Designated Plant by the Carrier unless otherwise agreed by Buyer. Buyer will contract directly with the Carrier for shipment to the Buyer's Designated Plant(s).

      (b)     Buyer will advise Seller on or before the 15th day of each calendar month preceding scheduled Shipments of the number of Shipments it desires to load during the succeeding calendar month to fulfill the transaction quantity and Buyer's desired loading dates and delivery schedule. Schedules shall include, without limitation, loading dates and loading facilities designated as Loading Points for such Shipments and shall be established by the parties in accordance with Buyer's requirements for the Designated Plant during the Nomination Period and within each month. In the event that the parties do not agree on a mutually acceptable delivery schedule for any calendar month, all deliveries for that month will occur in approximately ratable amounts. Delivery must be completed by the last day of the delivery month. The "Nomination Period" shall be (check one) [ X__ Monthly], [___Quarterly], [___ Other].

      (c)     At the Loading Point, Seller shall provide rail trackage sufficient for efficient and dependable loading of trains transporting Buyer's coal and shall provide loading equipment capable of loading rail cars that is adequate and dependable. Seller shall operate the Loading Point in such a manner as to enable Seller to load coal in accordance with the parties' agreed schedule. Seller shall ensure that any extraneous material, foreign substances, or debris is removed from each railcar prior to loading. Buyer shall pay all freight and other charges imposed by the Carrier for transporting shipments from the Loading Point to the Designated Plant. Notwithstanding the preceding sentence, Seller shall bear all expenses and costs associated with the delivery of coal to, and the loading and the loading of coal into rail cars at, the Loading Point and shall indemnify Buyer against all claims, demands, actions, suits, liabilities, and judgments (collectively, "Claim Matters") directly or indirectly related to such delivery and loading of coal at the Loading Point, except where the Claim Matters arise solely from the negligence or willful misconduct of Buyer or the Carrier in the performance of its obligations under this Agreement.

3

(d)     In the event Seller, except as excused by Force Majeure, shall fail to deliver coal to the Carrier in time to maintain the established schedules, Buyer may, in addition to its other remedies available at law or under this Agreement, obtain coal from an alternative source and Seller shall reimburse Buyer for: (i) the difference, if any, between (a) the actual price of the replacement coal (plus the cost of transporting the replacement to Buyer's Designated Plant), plus taxes), and (b) the price Buyer would have paid for the coal under this Agreement (plus the cost, if any, that Buyer would have paid under this Agreement to transport such coal to the Designated Plant), plus taxes; and (ii) any and all transportation, storage, handling,  delivery or other expenses that have been incurred by Buyer in purchasing such replacement coal. In addition, failure of Seller to make delivery of the coal to the Carrier in accordance with the schedule will be proper cause, at Buyer's option, for cancellation of this Agreement.

(e)     If Seller fails to satisfy the loading requirements of the Carrier under Carrier's contract with Buyer, except as excused by Force Majeure, Seller shall reimburse Buyer for any resulting car-detention charges, demurrage, or other costs that are paid by Buyer to the Carrier as a result of such failure. Seller shall conform to all of the Carrier's restrictions concerning maximum allowable gross railcar weights; if railcars are overloaded, Seller shall be responsible for any associated costs for reducing the weight of railcars to comply with the Carrier's restrictions and shall provide Buyer with corrected governing weight documentation. If Seller fails to tender sufficient coal to satisfy the minimum train weight of Carrier, or to satisfy the quantity requirements set forth in this Agreement, thereby causing non-compliance with the requirements of the Carrier, Seller shall reimburse Buyer for any resulting freight charges that are paid by Buyer to the Carrier over the amount of such charges otherwise payable. Seller shall make reasonable efforts to enable Buyer to comply with the tonnage requirements, if any, of the Carrier, and if Seller fails to tender sufficient coal to satisfy the quantity requirements set forth in the Agreement and the failure is not excused by Force Majeure, Seller shall be liable to Buyer for the amount of any tonnage shortfall payment that is paid by Buyer to the Carrier as a result of Seller's failure.

(f)     Seller shall remit to Buyer any payment required to be paid or owed to Buyer under this Agreement within thirty (30) days from receipt of Buyer's written statement concerning the amount(s) owed. If Seller fails to make timely payment of such amount(s), Buyer may deduct such amount(s) from any sum owed by Buyer to Seller under this Agreement. This right is in addition to Buyer's other remedies available at law and under this Agreement.

(g)     If in order to comply with Buyer's required delivery date it becomes necessary for Seller to ship by a more expensive means than Carrier, any increased transportation costs resulting therefrom shall be paid by Seller. Seller shall notify Buyer promptly of any delays or threatened delays in the performance of any order given by Buyer pursuant to this Agreement. No acceptance of coal after the scheduled delivery date will waive Buyer's rights with respect to such late delivery nor shall it be deemed a waiver of future compliance with the terms hereof.

8. Price.

(a)     Buyer shall pay Seller $ 71.00 FOB railcar for each net ton of coal sold hereunder during the term. The price shall be firm and not subject to change during the term hereunder whatsoever, except for changes in the Calorific Variation of the coal as noted below in Paragraph 12.     The price stated above shall include, without limitation, all costs of mining, processing, marketing, and quality control work necessary to meet the requirements of this Agreement.

4

(b)  Buyer shall have the right to require that Seller apply a freeze prevention agent to the coal being delivered under this Agreement by the Buyer whenever applicable to promote its handling in freezing weather. Buyer may, at its option, designate the quantity to be applied and of the types of freeze-proofing material the Seller is to use.  Buyer shall pay the Seller the actual cost for the freeze proofing, which shall be agreed to by the parties promptly after Buyer's request.  Seller shall provide sufficient documentation to enable Buyer to verify the amounts of freeze proofing applied and the total direct costs associated with such amounts.  Buyer shall have the right to review and approve the freeze proofing charges prior to payment.

9.  Payment Terms.

(a)      Seller shall invoice Buyer for each Shipment within ten (10) days of delivery of the Shipment to the Designated Plant.  Payment for coal delivered hereunder shall be based on railroad weights determined by certified scales.  Weighing of coal shall be at Seller's expense.  Rail cars reaching the Designated Plant empty or showing an obvious loss of coal in transit shall have their weight determined by mutual agreement of Buyer and Seller or by direct measurement, where possible.

(b)      Buyer shall make payment  by electronic transfer in immediately available United States funds, with payment terms 2% 10, Net 30 days from date of invoice.  Buyer's payment for each Shipment shall be complete when appropriate adjustments have been made and applied pursuant to the paragraphs herein entitled "Calorific Variation" and "Quality".  Seller's acceptance of the amounts paid by Buyer for the Shipment shall constitute full and final settlement of any and all claims by Seller for costs and expenses (including, without limitation, taxes, fees, assessments, premiums and penalties) incurred or paid by Seller, either while this Agreement is in effect or at any time in the future, with respect to the mining, processing, production or sale of coal under this Agreement.  Seller shall indemnify Buyer against, and hold Buyer harmless with respect to, any claim or liability related to such costs or expenses.

10.  Title and Risk of Loss

Title to the coal  and risk of loss of the coal supplied under this Agreement will pass to Buyer at the time the coal is properly loaded onto railcars for delivery to the Mill or other destinations designated by Buyer.

11.  Quality.

(a)      The coal purchased pursuant to this Agreement shall conform to the specifications set forth in Attachment A attached hereto (the "Specifications").

(b)      If any foreign matter or extraneous material which was in the Shipment of coal at the time of delivery by Seller causes damage to operating, receiving, or handling equipment, Buyer shall have the right to reject the Shipment and/or suspend all further deliveries of coal from Seller in accordance with Sections 18 and 19 of this Agreement by giving notice thereof to Seller.  In its notice of damage to Seller, Buyer will provide a written description of the damage experienced and, in writing, set forth Buyer's reason(s) for attributing such damage to foreign matter within Seller's coal Shipment.   Shipments shall not resume until Seller has provided reasonable assurance to Buyer that such damage will not occur in future Shipments.  Seller shall be liable for the costs incurred by Buyer in connection with repair or replacement of damaged equipment.   This remedy is available in addition to other rights and remedies of Buyer available in equity and under this Agreement ("Remedies").

5

12. Sampling and Analysis.

Seller is responsible for collecting samples on each Shipment of coal at the time of loading, and for completing a short proximate analysis on the samples, as well as retaining a split sample from each Shipment for at least sixty (60) days, for later testing. Seller shall promptly provide sample splits and a report of each sample's quality to Buyer. Methods of sampling shall be pre-approved by Buyer and all sampling and analysis shall be performed in accordance with the applicable ASTM standards. Any cost associated with sampling of coal shall be to Seller's account. Buyer may observe any sampling or sample preparation performed by Seller. Results of the full proximate analysis, together with a list of the ASTM test methods used and the railroad car numbers for each Shipment, shall be e-mailed or faxed to Buyer's designated delivery location within twenty four (24) hours following completion of the analytical tests. The samples collected at the Loading Point at time of loading of the coal shall govern quality disputes under this Agreement. In the event Buyer disputes the Seller's analysis of the mine end sample, the retained sample split shall be sent to a mutually agreeable nationally recognized independent coal testing laboratory for a referee analysis. The results of the referee analysis shall be binding upon both parties. If the referee analysis results are different from those in Seller's analysis, Seller shall pay for the referee analysis. If the referee analysis results are the same as the Seller's analysis, Buyer shall pay for the referee analysis.

In addition to an analysis covering each Shipment above, Seller shall provide Buyer's Designated Plant with the following quality reports:

     1. Monthly calculated short proximate analysis covering individual Shipments for the month;

     2. Quarterly (from retained samples) full proximate analysis including four count fusion temperature, grind, mercury and lead content of the ash.

13. Calorific Variation.

A premium/penalty shall be added/deducted from the price of the coal by Buyer based on the calorific variation in the Btu content, based on full proximate analysis reports generated on the samples collected above. For each Btu above or below the "As Received" Btu guarantee stated in the Specifications, the price of the coal shall be adjusted by a factor of $.0062. The premium/penalty shall be determined on a per-Shipment basis and the calculation along with the adjustment shall appear as a separate line item on the Seller invoice for the coal. Examples of the calculation of the Btu adjustment are included below for illustrative purposes only. These examples assume the contract has a 12,500 Btu guaranteed, a Btu adjustment of $.0062, and a Shipment of 9,000 tons:

     a. Premium – coal analyzing at 13,175 Btu/# "As Received":
       **13,175 – 12,500 guarantee = 675 x $.0062 = $4.1850 x 9,000 tons shipped = $37,665.00 premium

     b. Penalty – coal analyzing at 12,400 Btu/# "As Received":
       **12,400 – 12,500 = (-100) x $.0062 = <$0.620> x 9,000 tons shipped = <$5,580.00> penalty

14. Nonperformance.

Nonperformance shall include but not be limited to late delivery of coal to the Carrier, delivery of coal not conforming to the Specifications, breach of any of Seller's warranties hereunder, failure to comply with Applicable Laws, failure to deliver all scheduled coal during any month, any other default or failure of compliance by Seller with the terms and conditions hereof, or the commencement or continuance of any bankruptcy or insolvency proceeding by or against Seller. A valid Force Majeure occurrence shall not constitute nonperformance under this Agreement.

15. Termination.

(a)    Buyer may terminate this Agreement for default if, after Buyer has given written notice of the particulars of the default, Seller has failed to cure the same within fifteen (15) days of receipt of the notice or, if the default is not capable of being cured within such time, Seller has not within such 15-day period commenced action to cure promptly after receipt of notice and presented to Buyer a plan for cure acceptable to Buyer. In such event, Buyer shall not be liable to Seller for any amount, except for the payment for coal accepted by Buyer prior to termination at the last agreed- upon price, and Seller shall be liable to Buyer for any and all costs, expenses, losses and damages sustained by reason of the default which gives rise to the termination. The right of termination is in addition to all other Remedies available to Buyer for nonperformance.

(b)    In addition to and not as a limitation upon Buyer's other Remedies, Buyer may elect to forego its right to terminate this Agreement and may require Seller to perform its obligations under this Agreement. The exercise of this election shall not constitute a waiver of Buyer's right to terminate for subsequent defaults, including without limitation Seller's refusal to perform as required under the preceding sentence.

16. Seller's Warranties.

(a) Seller represents and warrants as follows: (i) Seller owns, leases or has binding contractual supply commitments from and authority to act as broker for the Approved Sources; (ii) Seller shall continue to own, lease or have contractually committed to it the Approved Sources during the term of this Agreement; (iii) the Approved Sources contain economically recoverable coal of a quality and in quantities that shall be sufficient to satisfy the requirements of this Agreement, including without limitation the Specifications ; (iv) during the term of this Agreement, Seller shall not use or sell coal from the Approved Sources in a way that shall reduce the economically recoverable balance of coal in the Approved Sources to an amount less than the quantity of coal to be supplied under this Agreement; and (v) all Shipments under this Agreement shall be mined from the Approved Sources unless Buyer agrees to Other Sources pursuant to Section 6.

(b) Seller expressly warrants that it will convey good title to all coal furnished hereunder. Seller further warrants that Seller shall defend Buyer's title with respect to such coal and shall hold harmless and indemnify Buyer against all claims, demands, actions, suits, liabilities, and judgments asserted against Buyer by any third party with respect to such title and all damages, costs, and expenses (including, without limitation, reasonable attorney's fees and litigation expenses) incurred by Buyer in defending such title.

(c) The warranties of Seller shall inure to Buyer, its successors, and assigns. NO ATTEMPT BY SELLER TO DISCLAIM, EXCLUDE, LIMIT, OR MODIFY ANY WARRANTIES OR SELLER'S LIABILITY SHALL BE OF ANY FORCE OR EFFECT.

7

17. Coal Not Conforming to Specifications.

No coal received by Buyer pursuant hereto shall be deemed accepted until Buyer has had reasonable opportunity to review laboratory analyses. Notwithstanding any such review, Seller shall be solely responsible for the conformance of the coal to the Specifications. Title to all nonconforming coal shall immediately revert to Seller.

18. Rejection Rights. Buyer shall have the right, at its sole option, and in addition to and not as a limitation upon Buyer's other Remedies, to reject any Shipment by written notification to Seller, under any one or more of the following circumstances: (i) any Shipment that fails to meet the Specifications, or (ii) any Shipment that is contaminated with foreign matter or extraneous materials, or (iii) the Shipment contains coal that was mined or produced from a source other than the Approved Sources without obtaining Buyer's prior consent. Buyer shall give Seller prompt written notice of the rejection of a Shipment. After receipt of such notice, Seller shall not resume Shipments under this Agreement until the coal quality or other deficiency has been corrected to Buyer's satisfaction. If Purchaser rejects a Shipment, then Seller shall immediately remove, at Seller's expense, the Shipment from Buyer's facilities or from transportation equipment and shall reimburse Buyer for all charges and costs (including, without limitation, transportation and storage costs) incurred and paid by Buyer in connection with the Shipment. Seller shall make commercially reasonable efforts to replace the rejected Shipment no later than ten (10) days from the original load date. Any Shipment delivered in any calendar month that has been rejected by Buyer in accordance with this Section and not made up by the end of such calendar month shall be deemed to have not been delivered for purposes of calculating damages under this Agreement.

19. SuspensionRights.

(a) In addition to and not as a limitation upon Buyer's other Remedies , Buyer may suspend Shipments immediately, by giving written notice to Seller, under any one or more of the following circumstances: (i) any Shipment fails to comply with any one or more of the Specifications set forth inAttachment A; (ii) any Shipment contains foreign matter or extraneous material as described in Section11(b); or (iii) any Shipment contains coal that was mined or produced from a source other than the Approved Sources without obtaining Buyer's prior written consent. Buyer, at its sole option, may accept any Shipment(s) in transit at the time such notice is given. Notwithstanding the provisions of Section 14, three (3) or more suspensions during any consecutive sixty-day period shall be deemed a material breach of this Agreement, for which Buyer shall have the right, exercised in its sole discretion, to terminate this Agreement immediately by giving Seller written notice thereof, which shall specify the effective date of termination.

(b) After a notice of suspension is given pursuant to Section 19(a), Buyer may terminate this Agreement unless Seller gives adequate assurance, within thirty (30) days after receipt of such notice, that Seller can and will comply with the Specifications and the other requirements of this Agreement. Such assurance may, at Buyer's option, be provided by means of a complying test Shipment scheduled and sampled pursuant to the provisions of this Agreement. All special handling costs (including, without limitation, costs related to stockpiling, segregation and transportation) associated with any such test Shipment shall be borne by Seller. If Buyer's analysis of the test Shipment shows it to be in compliance with each of the requirements of this Agreement, Shipments under this Agreement shall resume. Buyer thereafter shall determine whether to make up any Tonnage Shortfall that is caused by a notice of suspension pursuant to Section 19(a). If Buyer elects to make up the Tonnage Shortfall, the

8

parties shall agree on a schedule that shall allow the Tonnage Shortfall to be supplied within a period no longer than six (6) months after Shipments have resumed; and the term of this Agreement may be extended to accommodate such schedule. The price to be paid for any such makeup tons shall be determined according to the contract price in effect during the period in which Shipments were suspended.

(c) If (i) Buyer does not receive, within thirty (30) days after Seller's receipt of a notice of suspension pursuant to Section 19(a), adequate assurance of Seller's ability to supply coal that complies with the requirements of this Agreement or (ii) a test Shipment under Section 19(b) fails to comply with such requirements, Buyer shall notify Seller of such circumstance. At the same time, Buyer may cancel the remaining Shipments to be supplied under this Agreement and may terminate this Agreement immediately by giving Seller written notice thereof, which shall specify the effective date of termination.

(d) In the event that Buyer suspends Shipments pursuant to Section 19(a), then Seller shall reimburse Buyer for all charges and costs (including, without limitation, freight charges and transportation costs related to the suspension and special handling costs associated with a test Shipment under Section 19(b)) incurred and paid by Buyer in connection with the suspension.

20. Legal Compliance.
Seller warrants and agrees that in the performance of its obligations hereunder, Seller, its agents, employees, carriers and subcontractors shall (a) comply with all applicable federal, state and local laws, ordinances, codes, rules, regulations and orders, including executive orders now existing or hereafter enacted, adopted or enforced by any governmental body or agency, including where applicable all such laws, ordinances, codes, rules, regulations, and orders pertaining to labor and working conditions (including Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Act of 1974 and all laws, regulations and orders with respect to use of U.S. citizens or properly documented alien workers under the Immigration Act of 1990 and the Immigration and Nationality Act of 1952, as amended), safety and health, food and drug quality, and hazardous materials ("Applicable Laws"); (b) apply for, obtain, and pay for all necessary permits and licenses, and pay applicable fees in connection therewith, and (c) pay promptly when due any and all applicable sales, excise, or other taxes due on materials furnished in connection with services performed, and all taxes and amounts due under applicable unemployment, social security, and worker's compensation laws.

21. Indemnification.
To the fullest extent permitted by law, Seller shall defend, indemnify and hold Buyer and its affiliates and their respective directors, officers, employees, agents and representatives (the "Indemnified Parties") harmless from and against all liability, loss, claims, demands, damage (including damage to property or bodily injury), and expense (including court costs and reasonable attorneys' fees) arising out of or in any way resulting from Seller's performance or non-performance hereunder, including any defect or nonconformity with Seller's warranties of the coal delivered hereunder, any negligent, wanton, grossly negligent or intentional wrongful act or omission of Seller, its agents, employees, or subcontractors, any failure by Seller, its agents, employees, carriers, or subcontractors to comply with the terms hereof, or any failure to comply with Applicable Laws, any breach of this Agreement or any failure of Seller, its agents, employees, carriers or subcontractors to comply with Applicable Laws, except that Seller shall not be liable for the sole negligence of Buyer.

9

22. Force Majeure.

(a)     "Force Majeure", as used herein, means a cause reasonably beyond the control of a party that prevents or restricts the mining, processing, loading or delivery of Seller's coal or the delivery unloading, storing, or use of Seller's coal at the Designated Plant. Neither party hereto shall be liable for delay or failure to perform under this Agreement (other than the payment of amounts when due) to the extent the delay or failure results from any Force Majeure event. Examples of Force Majeure events include, but are not limited to, Acts of God, acts of terrorism, explosion, fire, flood, insurrection, strike, lockout or walkout, riot, interruptions to or contingencies of transportation (including but not limited to an event of force majeure under the rail contract between Buyer and Carrier), war, act or demand of governmental authority, or any other similar cause beyond such party's control. Force Majeure shall not include, and neither party shall be excused from performance because of, (i) the development or existence of economic conditions that may adversely affect the anticipated profitability of a party's activities under this Agreement, (ii) acts or omissions of a party that constitute mismanagement or fraud on the part of such party, or (iii) reduced productivity of labor employed by a party in its activities under this Agreement (unless such reduced productivity results from a labor work stoppage).

(b)     The party declaring Force Majeure shall promptly notify the other, in writing, of such fact and shall take commercially reasonable action to mitigate the effects of the Force Majeure event. Neither party shall be required to settle differences with employees or unions or governmental claims by acceding to any demands when, in the discretion of the party whose performance is impaired, it would be inadvisable to accede to such demands. Shortfalls in tonnage caused by events of Force Majeure shall only be made up upon the mutual consent of the parties. If, due to an event of Force Majeure, the Seller is not able to perform during such event, Buyer may purchase its coal requirements from a third party. If a Force Majeure event shall occur at the Mill, Seller shall use all commercially reasonable efforts to find an alternative source of coal for the Mill at the prices agreed to hereunder. If, due to an event of Force Majeure, the Seller is not able to perform for a consecutive period of at least forty-five (45) days, Buyer may terminate this Agreement by providing Seller with written notice of termination.

23. Environmental Law Changes.

If a permit at Buyer's Designated Plant changes such that a material change in coal specification is required for compliance with such permit (for example, changes required due to Boiler MACT rules, regulations and /or statutes), Buyer reserves the right, at its discretion, to change the Specifications. Seller shall have the right to propose, within thirty (30) days of the notice from Buyer of the change in Specifications, any steps available to Seller in its mining and processing of the coal, in the supply of substitute coal, or other measure that would result in as low a delivered cost of fuel at the Designated Plants as Buyer could obtain by purchasing reasonably available substitute fuel, taking into consideration any fees, taxes, costs or other economic burdens imposed on the use of coal at the Designated Plants. In the event that Buyer determines, in its reasonable judgment, that Seller cannot achieve this result, then Buyer may terminate this Agreement by giving Seller written notice thereof, which shall specify the effective date of termination and shall be given at least ninety (90) days prior to such date. Buyer may give such notice either before or after the material change in coal specification becomes effective.

24. Confidentiality.

The contents of this Agreement, including without limitation pricing and delivery information, and all related commercial and technical information of both parties shall be kept secret and confidential by Buyer and Seller and

10

will not be divulged by Buyer or Seller to any third party, and shall not be utilized by Buyer or Seller otherwise than in connection with this Agreement.

25. Limitation on Buyer's Liability.
In no event shall Buyer be liable to Seller, in contract or tort, for any indirect, special, incidental or consequential damages including by way of illustration and not of limitation, loss of use, loss of work in process, downtime or loss of profits, unless the consequential damages are caused by an intentional wrongful act or omission of Buyer.

26. Access to Coal Property.
Buyer shall have the right for it or its representative to at all times enter upon the Approved Sources or other appropriate locations for any of the following purposes: (i) to observe and examine the method and manner of, and equipment used in, mining, producing, washing, loading, unloading, transporting, sampling, weighing, analyzing, or handling of coal to be supplied under this Agreement; (ii) to take samples of coal for Buyer's analyses; or (iii) in connection with any accounting, audit, or examination of Seller's records. No such observation by Buyer shall be deemed a waiver of any of Buyer's rights or relieve Seller of any obligations under this Agreement.

27. Audit.
Seller shall maintain accurate records relating to Shipments under this Agreement in accordance with generally accepted accounting principles and shall retain such records for at least three (3) years after this Agreement is terminated or expires. Seller shall make such records available to Buyer, its accountants, auditors, or other authorized representatives, who shall be given access to and be permitted to examine such records at reasonable times. If an audit determines that any payments previously made under this Agreement were not properly calculated, adjustments shall be promptly made in amounts to be paid in the future for Shipments under this Agreement to reflect the proper amounts of such adjustments; or if no future payments are then due, payments shall be promptly made to reflect the difference between the previous payments and the proper amounts determined by audit.

28. Assignment.
Seller may not assign, transfer or hypothecate this Agreement or any part hereof or any monies payable or to become payable hereunder, unless it obtains the prior written consent of Buyer. Any attempted assignment, transfer or hypothecation made without the prior consent of Buyer shall be void.

29. Rights Under Bankruptcy.
Seller and Buyer shall retain all of their respective rights under the applicable provisions of the United States Bankruptcy Code (the "Bankruptcy Code") and be subject to the applicable provisions of the Bankruptcy Code.

Further, Seller and Buyer agree that entering into this Agreement and performing all obligations described herein is an ordinary course transaction for each party's business.

30. Waiver.
Any waiver by Buyer or Seller of strict compliance with any of the provisions hereof shall not be deemed a waiver of any other provisions hereof and shall not be deemed a waiver of any of Buyer's or Seller's rights, privileges, claims, or remedies, nor of Buyer's or Seller's right to insist on strict compliance thereafter.

31. Notices.
Except for shipping notices (to be provided as agreed by the parties) and except as otherwise provided in this Agreement, any notice, request, consent, demand, report, or statement (collectively, "Notice") given by one party to the other party shall be in writing and shall be sent by facsimile (in which case the Notice shall be deemed to have

11

been received upon receipt of verifiable fax), overnight courier (in which case the Notice shall be deemed to have been received on the next business day after it is sent) or by certified mail (in which case the Notice shall be deemed to have been received 72 hours after it is sent) to the appropriate addresses of facsimile numbers listed in this Section 28.

Notices sent to Buyer:

RockTenn
3950 Shackleford Rd.
Duluth, GA 30096
Attn: Jim Tuttle
Director, Chemical & Energy Procurement
Email: JTuttle@Rocktenn.com

With a copy to :

Rock-Tenn Company
504 Thrasher Street
Norcross, GA 30071
Attn: General Counsel
Fax: 770-248-4402

Or to such other address as Buyer may designate by Notice to Seller.

Notices sent to Seller:

Southern Coal Sales Corporation
302 South Jefferson Street, Suite 600
Roanoke, VA 24011
Attn: Steve Sarver
Email: steve.sarver@justicecorporation.com

Or to such other address as Seller may designate by Notice to Buyer.

32. General.

(a) This Agreement constitutes the entire agreement between the parties, and all prior agreements, written or oral, relating to the subject matter hereof are superseded by the terms hereof. Such terms may be modified only in a writing signed by authorized representatives of both parties.

(b) The provisions of this Agreement are severable and in the event any provision is held to be unenforceable, the remaining provisions will continue in full force and effect.

(c) It is understood that Seller is an independent contractor and not an employee or agent of Buyer and that Seller shall have no power whatsoever to bind Buyer in any way in any dealings between Seller and third parties and shall not attempt or purport to do so.

(d) This Agreement is governed by and shall be construed in accordance with the laws of the state of Va., without regard to the conflicts of law principles thereof.

(e) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute a single instrument.

12

IN WITNESS WHEREOF, the parties have caused this Coal Supply Agreement to be executed as of the date first above written.

**Seller:**

Southern Coal Sales Corporation

By: _____

Name: _Steven C. Saraer_

Title: _Senior Vice President_

**Buyer:**

**ROCKTENN CP, LLC**

By: _____

Name: _Robert B. McIntosh_

Title: _EVP + General Counsel_

13

ATTACHMENT A

RockTenn Coal Specification
Fernandina Beach, FL

The coal delivered hereunder shall conform to the following specifications on an "as received" basis
with all sampling and analysis having occurred in accordance with all applicable current ASTM standards

| Specification Parameter | Typical Quality | Reject Limits (Per Shipment) |
|---|---|---|
| BTU/lb | 12,500 | 12,000 |
| Moisture (%) | 8.0 | >10.0 |
| Ash (%) | 10.0 max | >10.0 |
| SO2 (lb/MMBTU) | 1.15 | >1.20 |
| Volatile (%) | 32 | <30 |
| **Size** | | |
| Top Size (inches) | 2" x 0" | >2 1/2" |
| Fines (% by weight passing 1/4" screen | | >50 |
| Grindability (HGI) | 42 | <40 |

Ash Fusion Temperature (deg F) (ASTM D1857)

| Reducing Atmosphere | | |
|---|---|---|
| Initial (H=1/2W) | 2700 | <2600 |
| Fluid (H=1/2W) | 2700 | <2600 |

NOTES

    1. As used herein >means "greater than" and <means "less than"
    2. The ammount of fines < 1/4" shall be determined from a sample which
has been air dried under prescribed conditions in accordance
with ASTM D4749 using a 1/4" (6.3 mm) round hole perforated
plate sieve or a No. 4 (4.75 mm) wire cloth sieve square openinings.

14

ATTACHMENT B

OTHER SOURCES OF COAL

None

**From:** Jodi Wright [mailto:JWRIGHT2@rocktenn.com]
**Sent:** Wednesday, January 02, 2013 10:04 AM
**To:** Summer Harrison; Steve Sarver; Roberts, Becky
**Cc:** Stark, Larry; Greathouse, Mike; James Tuttle; Byron Pikula; Hank Hagins; Art Renfro
**Subject:** FERNANDINA COAL TRAINS

In order to full fill our commitments with Duke Energy this is what I've done with scheduled trains.

Duke has permit number 925 for January 4th.

Southern still has reservation #18649 January 15th.

Cancelled Southern reservation #18650 January 27th.

I will need to submit a reservation for Dukes last train the last week of January.

Thank you for your cooperation.

JODI WRIGHT
ROCKTENN
FERNANDINA BEACH FL
904-277-5772

This message, including its attachments, is an electronic communication under the Electronic Communications Privacy Act, 18 U.S.C. Section 2510. This message is the confidential property of Rock-Tenn Company, Norcross, GA. Disclosure is strictly limited to recipients intended by sender. Unless previously authorized in writing, this message does not constitute an offer, acceptance, or agreement of any kind. This message may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient or responsible for delivery to the intended recipient, you are advised that use, dissemination, forwarding, printing, or copying of this message is STRICTLY PROHIBITED. If you receive this message in error, please notify the sender immediately by return e-mail and delete the message from your system. Sender is not liable for damage, errors or omissions related to or caused by transmission of this message.

Exhibit B

**From:** James Tuttle <JTuttle@rocktenn.com>

**Date:** Tue, 5 Feb 2013 18:38:29 +0000

**To:** Steve Sarver (steve.sarver@justicecorporation.com)<steve.sarver@justicecorporation.com>

**Cc:** James Tuttle<JTuttle@rocktenn.com>

**Subject:** FW: Railcar Sample- Southern Coal

Steve,

Have not heard from you on this.

This size of coal is a clear violation of the our specification.

Jim

Exhibit C

**From:** steve.sarver@justicecorporation.com [mailto:steve.sarver@justicecorporation.com]
**Sent:** Tuesday, February 05, 2013 6:10 PM
**To:** James Tuttle
**Subject:** Re: Railcar Sample- Southern Coal

Jim. I have just completed my mine inspection and investigation. All coal was crushed. The parameters on the crusher were not properly adjusted. The problem has been corrected. The February train will not experience any problems. Thanks for your patience. Steve

Sent from my Verizon Wireless BlackBerry

---

**From:** steve.sarver@justicecorporation.com

Exhibit D

**From:** steve.sarver@justicecorporation.com [mailto:steve.sarver@justicecorporation.com]
**Sent:** Thursday, February 14, 2013 12:58 PM
**To:** Jodi Wright; Summer Harrison
**Cc:** Byron Pikula; Donald Davis; Art Renfro; Max Hord; James Tuttle; Jay Justice
**Subject:** Re: LOADING OF FERNANDINA BEACH TRAIN

To all. The mechanical situation at JF has an indefinite time line. We will load the train immediately from Harlan district - load out # 43522- Balkan load out. The Balkan load out is next door to the Sequoia load out and we reciprocate with each other. Please request CSX to place the train immediately. We have the coal stockpiled to load. Thanks for your patience. Steve and Summer

Sent from my Verizon Wireless BlackBerry

# Exhibit E

---------- Forwarded message ----------
From: **James Tuttle** <JTuttle@rocktenn.com>
Date: Fri, Feb 22, 2013 at 5:44 PM
Subject: Southern Coal lack of Performance
To: "steve.sarver@justicecorporation.com" <steve.sarver@justicecorporation.com>
Cc: James Tuttle <JTuttle@rocktenn.com>


RockTenn remains very concerned about Southern Coal's ongoing lack of performance.  RockTenn plans to respond more formally on Monday.



Jim Tuttle

Director of Energy & Chemical Procurement

RockTenn

JTuttle@RockTenn.com

Office (770) 326- 8244

Cell (678) 833- 6484


# Exhibit F

---------- Forwarded message ----------
From: <steve.sarver@justicecorporation.com>
Date: Sat, Feb 23, 2013 at 6:17 PM
Subject: Re: FERNANDINA COAL TRAIN
To: Plant Manager Jodi Wright <jwright2@rocktenn.com>, Jim Tuttle <jtuttle@rocktenn.com>
Cc: Art Renfro <ARENFRO@rocktenn.com>, Allen Sanders <asanders@rocktenn.com>, Hank Hagins
<hhagins@rocktenn.com>, Summer Harrison <summer.harrison@justicecorporation.com>

Jim and Jodi. I can load Rock Tenn immediately at Bardo. If you will contact CSX and permit the train we will
load immediately on arrival. Please confirm. Thanks. Steve
Sent from my Verizon Wireless BlackBerry

---

From: steve.sarver@justicecorporation.com
Date: Fri, 22 Feb 2013 22:16:17 +0000
To: Plant Manager Jodi Wright<jwright2@rocktenn.com>; Jim Tuttle<jtuttle@rocktenn.com>
ReplyTo: steve.sarver@justicecorporation.com
Cc: Art Renfro<ARENFRO@rocktenn.com>; Allen Sanders<asanders@rocktenn.com>; Hank
Hagins<hhagins@rocktenn.com>; Summer Harrison<summer.harrison@justicecorporation.com>
Subject: Re: FERNANDINA COAL TRAIN

Jodi. We will load the train next Wed- Feb 27 from our Sequoia load out at Bardo- where the December train
loaded. Thank you for your patience. The problems at Jones Fork were unforeseen. The ongoing JF situation
restricted both Jan and Feb trains. We will load March from Bardo. Thanks.
Sent from my Verizon Wireless BlackBerry

# Exhibit G

---------- Forwarded message ----------
From: <steve.sarver@justicecorporation.com>
Date: Sat, Feb 23, 2013 at 6:17 PM
Subject: Re: FERNANDINA COAL TRAIN
To: Plant Manager Jodi Wright <jwright2@rocktenn.com>, Jim Tuttle <jtuttle@rocktenn.com>
Cc: Art Renfro <ARENFRO@rocktenn.com>, Allen Sanders <asanders@rocktenn.com>, Hank Hagins
<hhagins@rocktenn.com>, Summer Harrison <summer.harrison@justicecorporation.com>

Jim and Jodi. I can load Rock Tenn immediately at Bardo. If you will contact CSX and permit the train we will
load immediately on arrival. Please confirm. Thanks. Steve
Sent from my Verizon Wireless BlackBerry

Exhibit H



February 25, 2013

<u>VIA EMAIL, FEDEX, AND CERTIFIED MAIL</u>

Attn: Steve Sarver
Southern Coal Sales Corporation
302 South Jefferson Street, Suite 600
Roanoke, VA 24011

Email: steve.sarver@justicecorporation.com

**Re:    December 23, 2012 Coal Supply Agreement Between RockTenn CP, LLC ("RockTenn") and Southern Coal Sales Corporation ("Southern Coal") (the "Coal Supply Agreement" or "Agreement")**

Dear Mr. Sarver:

I am writing to advise Southern Coal of RockTenn's position with respect to future purchases of coal by Southern Coal to RockTenn under the Coal Supply Agreement.

Southern Coal has failed to comply with the Coal Supply Agreement in a variety of ways, including but not limited to (a) Southern Coal's delivery of coal on or about February 4, 2013 was not in compliance with the Agreement's specifications in that the coal was delivered in 6 inch chunks, rather than in two chunks as required by Section 11(a) and Attachment A to the Agreement (about which problem RockTenn informed Southern Coal on February 4, 2013); (b) the train for the next delivery was ready to load on February 12, 2013, but Southern Coal had no coal to load at the loading station, so Southern Coal failed to make delivery of the coal to the rail carrier, which violated the Agreement; (c) the next train was to be loaded on February 19, 2013, but again Southern Coal failed to make delivery to the rail carrier, yet another violation of the Agreement.

Southern Coal assured it would load the train with coal on each of the last two failed deliveries. Late last Friday afternoon (February 22, 2013) Southern Coal unexpectedly said in an e-mail that it could load a train on February 27, 2012.  Given Southern Coal's recent record of failing to meet its commitments, RockTenn has no confidence that Southern Coal will actually have sufficient coal to load that train. RockTenn needs the coal very soon to maintain its operations.

Based upon the above events, RockTenn has the right, both under the terms of Agreement (including Section 7(d)) and based upon law (including the applicable version of Article Two of the Uniform Commercial Code), immediately to cancel its purchase of coal from Southern Coal for the remainder of the term of the Agreement and to purchase its coal elsewhere. In such event, RockTenn still has the right to recover from Southern Coal RockTenn's damages for the rest of the term of the Agreement (through December 31, 2013), including RockTenn's costs of cover, incidental damages, and consequential damages.

2071825 v1

3950 Shackleford Road • Duluth, GA 30096 • Tel: 770-448-2193

Nonetheless, in accord with Sections 14 and 15 of the Coal Supply Agreement, RockTenn hereby gives Southern Coal written notice of the particulars of the multiple defaults and an opportunity to cure such defaults, if Southern Coal can timely present to RockTenn a plan for cure that meets the requirements of Section 15 of the Agreement. At the present time, RockTenn doubts that a cure is possible. If Southern Coal fails to timely present a cure that complies with Section 15, RockTenn will continue to have the right to recover its damages, as described above.

Unless and until Southern Coal presents a cure that satisfies Section 15 of the Agreement, RockTenn hereby stops and suspends purchasing its coal from Southern Coal, in accord with both the Agreement and applicable law. For at least the short term, RockTenn will obtain its coal from another source.

RockTenn looks forward to Southern Coal's response at Southern Coal's earliest convenience.

Yours very truly,

ROCKTENN CP, LLC

By: _____
    Gregory L. King

cc:   Jim Tuttle
      Nancy Gordon

bcc:  Shea Sullivan
      Mike Hall

2071825 v1

EXHIBIT

I



February 25, 2013

ROCKTENN CP, LLC
Attn: Gregory L. King
3950 Shackleford Road
Duluth, GA 30096

Re:    Your February 25, 2013 letter to Steve Sarver

Dear Mr. King:

We are in receipt of the above referenced letter regarding the December 23, 2012 Coal Supply Agreement between RockTenn CP, LLC and Southern Coal Sales Corporation. While Southern Coal Sales Corporation disagrees with numerous assertions contained in the letter, it does not believe that providing a point by point rebuttal would be productive at this time given the current circumstances.

Per your request I am providing you with a written plan that addresses the issues outlined in your letter. First, Southern Coal Sales Corporation stands ready, willing and able to immediately deliver the February train. Please provide the permit for the train to be shipped out of Bardo, Kentucky this week. Second, please provide your proposed shipping schedule for March and the balance of 2013 so that we can mutually coordinate in a manner that is beneficial for both parties.

We believe this satisfies your request and the terms of the Coal Supply Agreement. Should you have any questions or concerns please feel free to contact me at your convenience. We look forward to receiving the permit for this week's delivery as soon as possible.

Sincerely,

Dustin M. Deane
Associate General Counsel

Justice Corporation |302 S. Jefferson Street, Ste 600 | Roanoke, VA 24011 |P: 540 776 7890 |F: 540 776 7892

EXHIBIT
J



7014 0150 0001 9184 6599

U.S. POSTAGE PITNEY BOWES

ZIP 40831 $ 008.45⁰
02 1W
0001375028 JAN 13 2015

WENDY FLANARY
CIRCUIT COURT CLERK
HARLAN CIRCUIT & DISTRICT COURTS
HARLAN COUNTY JUSTICE CENTER
129 SOUTH 1ST STREET, P.O. BOX 190
HARLAN, KENTUCKY 40831-0190

CI  15-CI-00016
626341

**ROCKTENN CP, LLC,**
**AGENT: CORPORATION SERVICE CO**
**421 W MAIN STREET**
**FRANKFORT KY 40601**