# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### SOUTHERN DIVISION: LONDON

| | | |
|---|---|---|
| SOUTHERN COAL SALES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION FILE NO.  6:15-cv-00018-DCR |
| v. | ) ) | |
| ROCKTENN CP, LLC, | ) ) ) | Removed from Harlan Circuit Court, Civil Action No. 15-CI-00016 |
| Defendant. | ) ) | |

## ANSWER AND COUNTERCLAIMS

Comes now the Defendant, RockTenn CP, LLC ("RockTenn"), and for its Answer, to the *Complaint*[1] of the Plaintiff, Southern Coal Sales Corporation, states as follows:

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims are barred by Plaintiff's multiple breaches of the subject contract.

---

[1] R. 1-3, at pp. 4-42.

### THIRD DEFENSE

Plaintiff's claims are barred by Plaintiff's indebtedness to RockTenn or are otherwise offset in whole in or part by Plaintiff's indebtedness to RockTenn.

### FOURTH DEFENSE

Plaintiff's claims are barred by the doctrines of unclean hands, laches, waiver, estoppel, acquiescence, *in pari delicto*, and promissory estoppel.

### FIFTH DEFENSE

Any alleged damages suffered by Plaintiff are the result of Plaintiff's own conduct and breaches of contract.

### SIXTH DEFENSE

Plaintiff's claims are barred by the terms of the parties' contract.

### SEVENTH DEFENSE

Plaintiff's claims are barred because RockTenn terminated the contract as a result of Plaintiff's multiple breaches and failure to cure.

### EIGHTH DEFENSE

Plaintiff's claims are barred by a failure and/or lack of consideration.

### NINTH DEFENSE

Plaintiff's claims are barred by Plaintiff's misrepresentations and bad faith.

## TENTH DEFENSE

Plaintiff's claims are barred by Plaintiff's failure to provide notice.

## ELEVENTH DEFENSE

Plaintiff's claims are barred by Plaintiff's lack of any damages caused by RockTenn or otherwise.

## TWELFTH DEFENSE

Plaintiff's claims are barred by the doctrine of substantial compliance.

## THIRTEENTH DEFENSE

Plaintiff's alleged damages are barred or lessened, in whole or in part, due to Plaintiff's failure to mitigate its alleged damages.

## FOURTEENTH DEFENSE

The Complaint, or evidence concerning the allegations in it, is barred in whole or in part by the merger doctrine and/or the parol evidence rule.

## FIFTEENTH DEFENSE

Plaintiff's claims for attorney's fees under its breach of contract count[2] are barred because such claims are not pled in the body of the Complaint.  Any claims for costs and/or attorney's fees by Plaintiff are barred or lessened because such costs or fees are not reasonable in amount.

---

[2] R. 1-3, at pp. 41-42.

## SIXTEENTH DEFENSE

RockTenn hereby responds to the individually numbered paragraphs of the Complaint as follows, and in so doing, incorporates in this section each and every defense asserted in its Answer hereinabove, as if set forth verbatim:

### PARTIES

1.     RockTenn is without knowledge or information sufficient to form a belief as to truth of the allegations in this paragraph of the Complaint, and therefore denies same.

2.     RockTenn admits that it is a limited liability company organized in Delaware with its principal place of business located at 504 Thrasher Street, Norcross, Gwinnett County, Georgia 30071.  RockTenn further admits that it is authorized to transact business in Kentucky and may be served through its designated registered agent. RockTenn denies that service of process was proper in this action, and reserves all rights and defenses accordingly.

### JURISDICTION AND VENUE

3.     RockTenn removed this action to the United States District Court for the Eastern District of Kentucky which RockTenn admits has subject matter jurisdiction in this action under 28 U.S.C. § 1332.

4.     RockTenn denies that it has been properly served and thus denies personal jurisdiction in this action.  RockTenn admits that it entered into a contract with Plaintiff for the supply of coal, the terms of which speak for themselves.

5.     RockTenn denies that venue is proper in this action in Harlan Circuit Court and reserves all of its rights under federal law with respect to venue for this case.

## STATEMENT OF FACTS

6.      RockTenn admits that it entered into the Coal Supply Agreement (the õSupply Agreementö), a copy of which is attached to the Complaint as Exhibit A,[3] and the terms of which speak for themselves.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

7.     The terms of the Supply Agreement speak for themselves and Plaintiff's allegations about the Supply Agreement's terms are made out of context and without reference to the other terms of the Supply Agreement which must be read together, as a whole.  RockTenn admits that the Supply Agreement provided that RockTenn would purchase all of its coal needed in its Fernandina Beach, Florida mill during the term of the Supply Agreement and under the terms and conditions provided in the Supply Agreement.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's

---

[3] R. 1-3, at pp. 17-31.

interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

8.    The terms of the Supply Agreement speak for themselves and Plaintiff's allegations about the Supply Agreement's terms are made out of context and without reference to the other terms of the Supply Agreement which must be read together, as a whole.  RockTenn admits that the Supply Agreement states that the product sold to RockTenn shall be sold FOB loaded into rail cars at the Loading Point.  RockTenn further admits that the Loading Point is defined as the Harlan District.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

9.    The terms of the Supply Agreement speak for themselves and Plaintiff's allegations about the Supply Agreement's terms are made out of context and without reference to the other terms of the Supply Agreement which must be read together, as a whole.  RockTenn admits that Paragraph 9 of the Complaint contains an accurate, but incomplete, quote from a portion of Section 7(b) of the Supply Agreement.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

10.    The terms of the Supply Agreement speak for themselves and Plaintiff's allegations about the Supply Agreement's terms are made out of context and without

reference to the other terms of the Supply Agreement which must be read together, as a whole.  RockTenn admits that Paragraph 10 of the Complaint contains an accurate, but incomplete, quote from a portion of Section 7(b) of the Supply Agreement.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

11.     The terms of the Supply Agreement speak for themselves and Plaintiff's allegations about the Supply Agreement's terms are made out of context and without reference to the other terms of the Supply Agreement which must be read together, as a whole.  RockTenn admits that Paragraph 11 of the Complaint contains an accurate, but incomplete, quote from a portion of Section 7(a) of the Supply Agreement.  RockTenn denies all allegations in the Complaint that reflect Plaintiff's interpretation of the Supply Agreement or otherwise are inconsistent with the terms of the Supply Agreement.

12.     RockTenn admits that Plaintiff made a test shipment of coal in December 2012 that was loaded on the train in Bardo, Kentucky.  RockTenn denies any additional allegations in this Paragraph.

13.     RockTenn admits that it accepted the test shipment of coal which appeared to be within the physical Specifications reflected in the Supply Agreement and communicated to Plaintiff that the coal was satisfactory for use in the Fernandina Beach mill.  RockTenn denies any additional allegations in this Paragraph.

14.    Denied.

15.    Denied.

16.    Denied.

17.    RockTenn admits that Plaintiff made a shipment of coal to RockTenn in late January 2013 that contained coal that was not within the Specifications required in the Supply Agreement.

18.    RockTenn admits that it obtained rail permits and arranged for the CSX train to deliver the late January 2013 coal shipment to the Mill.   RockTenn denies all allegations in this Paragraph inconsistent herewith.

19.    Denied.   The coal was out-of-spec and Plaintiff acknowledged its breach. RockTenn admits that it did not reject the January 2013 coal shipment, but RockTenn notified Plaintiff of Plaintiff's breach of the Supply Agreement for the out-of-spec coal.

20.    RockTenn admits that it notified Plaintiff that the January 2013 coal shipment failed to conform to the requirements in the Supply Agreement in emails, letters, in person, and over the telephone.   Plaintiff admitted the coal was out-of-spec and apologized and thanked RockTenn for its patience with Plaintiff's failure to comply with the Supply Agreement.   RockTenn denies that the problem with the out-of-spec coal was insignificant or that RockTenn agreed with Plaintiff that it was insignificant.

21.    RockTenn admits that Steve Sarver of Southern Coal emailed Jim Tuttle of RockTenn on February 5, 2013 admitting that the January 2013 shipment of coal did not comply with the Specifications in the Supply Agreement.  Mr. Sarver's email is attached to the Complaint as Exhibit D.[4]   RockTenn is without knowledge or information sufficient to form a belief as to whether Mr. Sarver went to the mine or investigated the problem.

22.    RockTenn admits that Mr. Sarver emailed Mr. Tuttle on February 5, 2013 admitting that the January shipment of coal did not comply with the Specifications in the Supply Agreement.  Mr. Sarver's email is attached to the Complaint as Exhibit D.[5] RockTenn is without knowledge or information sufficient to form a belief as to whether Plaintiff's problems were resolved or whether Mr. Sarver "insured that the parameters of the coal crusher were adjusted to correct the sizing."  RockTenn further denies that the out-of-spec coal was an insignificant problem.

23.    Denied.

24.    Denied.

25.    Denied.

---

[4] R. 1-3, at p. 34.

[5] R. 1-3, at p. 34.

26.    Denied with clarification.  RockTenn does admit that after Plaintiff had failed to load trains with coal for RockTenn on February 12 and February 19, 2013, Plaintiff made apologies and more empty promises to load a train with coal for RockTenn.  RockTenn denies any allegations inconsistent herewith.  RockTenn also incorporates the allegations of its Counterclaims below.

27.    Denied.

28.    Denied.

29.    RockTenn admits that Mr. Sarver sent a February 14, 2013 email, a copy of which is attached to the Complaint as Exhibit E.[6]  RockTenn denies that Plaintiff had coal ready to load.  In fact, Plaintiff failed to load a train for RockTenn on February 19, 2013 after Mr. Sarver had promised to do so in his February 14, 2013 email.

30.    Denied.  The parties scheduled the February 19 train which RockTenn arranged but Plaintiff failed to load.

31.    RockTenn denies that it failed to obtain requisite railroad permits and further denies that it violated any terms of the Supply Agreement.  On two separate occasions in February 2013, RockTenn had empty trains ready to be loaded with coal by Plaintiff, but Plaintiff failed to load those trains.

---

[6] R. 1-3, at p. 35.

32.     RockTenn denies that it failed to follow the terms of the Agreement at any time.  RockTenn admits that Mr. Tuttle sent Mr. Sarver an email on February 22, 2013, a copy of which is attached to the Complaint as Exhibit F,[7] after Plaintiff had failed to load its second consecutive train, and after RockTenn had learned that Plaintiff attempted to contract with another supplier to load noncompliant coal to be shipped to RockTenn. RockTenn denies all allegations in this Paragraph that are inconsistent with Mr. Tuttle's email and further denies all of Plaintiff's characterizations in this Paragraph about Mr. Tuttle's email and Mr. Sarver's emails.

33.     RockTenn admits that Mr. Sarver sent emails on February 22 and 23, 2013, copies of which are attached to the Complaint as Exhibit G.[8]  RockTenn notes that Exhibit G and other emails attached to the Complaint have been redacted to remove other emails within the same chain or conversation.  All emails should be read in context with the entire conversation and email chain and the parties' other communications. RockTenn denies the assertions in Mr. Sarver's emails (other than his acknowledgements that Plaintiff had repeatedly failed to perform the Supply Agreement) and denies all additional allegations in this Paragraph of the Complaint.

---

[7] R. 1-3, at p. 36.

[8] R. 1-3, at p. 37.

34.    RockTenn admits that Mr. Sarver sent emails on February 22 and 23, 2013, copies of which are attached to the Complaint as Exhibit G.[9]   RockTenn notes that Exhibit G and other emails attached to the Complaint have been redacted to remove other emails within the same chain or conversation.  All emails should be read in context with the entire conversation and email chain and the parties' other communications. RockTenn denies the assertions in Mr. Sarver's emails (other than his acknowledgements that Plaintiff had repeatedly failed to perform the Supply Agreement).

35.    Admitted.

36.    RockTenn admits that Mr. Sarver sent an email on February 23, 2013, a copy of which appears in Exhibits G[10] and H[11] of the Complaint.  RockTenn notes that Exhibits G and H and other emails attached to the Complaint have been redacted to remove other emails within the same chain or conversation.  All emails should be read in context with the entire conversation and email chain and the parties' other communications.  RockTenn denies the assertions in Mr. Sarver's emails (other than his acknowledgements that Plaintiff had repeatedly failed to perform the Supply Agreement).

---

[9] R. 1-3, at p. 37.

[10] R. 1-3, at p. 37.

[11] R. 1-3, at p. 38.

37.     RockTenn admits that it sent a letter to Plaintiff on February 25, 2013, a copy of which is attached to the Complaint as Exhibit I.[12]   RockTenn denies Plaintiff's mischaracterizations of the content of the letter and further denies that the letter was sent by RockTenn's counsel.   RockTenn denies any allegations in this Paragraph inconsistent with the terms of the February 25, 2013 letter.

38.     The allegations in this Paragraph contain Plaintiff's legal characterizations or opinions about the Supply Agreement.   The terms of the Supply Agreement shall govern the parties' rights and obligations thereunder, not Plaintiff's out-of-context mischaracterizations.   RockTenn denies Plaintiff's mischaracterizations about Section 15 of the Supply Agreement which provides RockTenn with the right to terminate the Supply Agreement under certain circumstances, among other things.

39.     RockTenn admits that it received a letter from Plaintiff's counsel Mr. Deane on February 25, 2013, a copy of which is attached to the Complaint as Exhibit J,[13] and the terms of which speak for themselves.   RockTenn denies any allegations in the Complaint that are inconsistent with the terms of the letter or the other written communications and documents in this matter.

---

[12] R. 1-3, at pp. 39-40.

[13] R. 1-3, at p. 41.

40.     RockTenn admits that the words "ready, willing and able" appear in Mr. Deane's February 25, 2013 letter.   RockTenn denies the assertions in Mr. Deane's February 25, 2013 letter and further denies that Mr. Deane's letter complied with the requirements of the Supply Agreement.

41.     RockTenn admits that Mr. Deane's letter requested that RockTenn provide a shipping schedule "for March and the balance of 2013".  RockTenn denies the assertions in Mr. Deane's February 25, 2013 letter and further denies that Mr. Deane's letter complied with the requirements of the Supply Agreement.  RockTenn further denies Plaintiff's legal opinions about the requirements of the Supply Agreement.

42.     Denied.

43.     Denied.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

44.     RockTenn incorporates all of the defenses and matters stated above as if fully repeated here.

45.     Denied.

46.     Denied.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

47.     RockTenn incorporates all of the defenses and matters stated above as if fully repeated here.

48.     Denied.

49.     Denied.

50.     Denied.  RockTenn further denies that Kentucky law applies to the Supply Agreement.

51.     Denied.

52.     RockTenn denies any and all allegations in the Complaint that are not specifically admitted above, including any allegations in Plaintiff's prayer for relief. RockTenn further denies that Plaintiff is entitled to any of the relief sought in the Complaint and/or prayer for relief.  RockTenn is entitled to its costs and attorney's fees incurred in defending against the Plaintiff's Complaint under the terms of the Supply Agreement, at law, and/or in equity.

**WHEREFORE,** RockTenn respectfully prays as follows:

(a)     that all claims asserted against RockTenn be dismissed with prejudice;

(b)     that all costs be taxed against Plaintiff;

(c)     that the Court award a judgment in RockTenn's favor in accordance with the counterclaims set forth below;

(d)     that the Court award RockTenn all of its attorney's fees and expenses incurred defending this action; and

(e)     for such other and further relief for RockTenn as this Court deems just and proper in the circumstances.

## COUNTERCLAIMS

In accordance with Fed. R. Civ. P. 13, as its counterclaims against Southern Coal Sales Corporation ("SCSC"), RockTenn CP, LLC ("RockTenn") shows the Court as follows:

1.     SCSC is subject to personal jurisdiction in this Court by virtue of filing the underlying Complaint in this action.   In addition, SCSC alleges that it transacts substantial business in Kentucky, including its coal sales from Kentucky, thereby making it subject to personal jurisdiction in this Court.  (See Complaint, ¶ 4).

2.     This Court has subject matter jurisdiction over these claims under 28 U.S.C § 1332 because SCSC and RockTenn are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.     Venue is proper in this Court under 28 U.S.C. § 1446(a) as this Court is the United States District Court for the district and division within which the action was originally pending prior to removal.  Venue is also proper under 28 U.S.C. § 1391(b)

because, according to SCSC, this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## BACKGROUND FACTS

### A) RockTenn's Fernandina Beach, Florida mill

4.       RockTenn operates a mill in Fernandina Beach, Florida (the ōMillö) that produces various components of containerboard used to manufacture corrugated boxes. The Mill relies on coal for a substantial part of its energy needs.

5.       The Mill cannot operate without an adequate and reliable supply of coal. Without coal meeting certain physical specifications, the Mill would have to shut down until coal is delivered.  An unscheduled shut down of the Mill would cause RockTenn substantial damages, both from the interruption of supply to the Milløs customers, but also in downtime costs and reputational damage for failing to meet its commitments. Therefore, the Mill makes its coal supply one of the top priorities to ensure uninterrupted production.

6.       The coal required at the Mill must meet strict specifications for such things as size of the chunks, moisture, ash, sulfur content and other variables.  A delivery of out-of-spec coal to the Mill is generally useless to the Mill and threatens a Mill shut down if not quickly replaced with in-spec coal.

### B)   RockTenn and SCSC's Coal Supply Agreement

7.      In 2012, RockTenn sought a new coal supplier for the Mill's 2013 coal requirements.

8.      RockTenn and SCSC ultimately reached an agreement in the Coal Supply Agreement ("Supply Agreement") in which SCSC would sell and RockTenn would buy coal in accordance with the terms in the Supply Agreement.  The parties entered the Supply Agreement as of December 23, 2012.   A copy of the Supply Agreement is attached to the SCSC Complaint as Exhibit "A."[14]

9.      The Supply Agreement required SCSC to supply coal within the specifications identified in the Supply Agreement mined from an "Approved Source" defined as the Sequoia Energy, LLC operation in Harlan County, Kentucky.  The Supply Agreement provided that "[u]nder no circumstances shall [SCSC] deliver coal from any source other than the Approved Sources without the prior written consent of [RockTenn]."  (Supply Agreement, § 5).

10.     The Supply Agreement provides that RockTenn's price for coal was $71.00 for each net ton of coal delivered FOB to the railcar.  The price included all costs of mining, processing, marketing, and quality control work necessary to meet the requirements and specifications in the Supply Agreement.  (Supply Agreement, § 8(a)).

_____

[14] R. 1-3, at pp. 17-31.

11.     Purchases under the Supply Agreement were ordered FOB loaded into train railcars at the "Loading Point," defined as the Harlan District.   It was RockTenn's responsibility to contract directly with the train/carrier (i.e., CSX Railroad) and arrange for the train with empty railcars to arrive at the Loading Point at the designated times for loading.  (Supply Agreement, § 7).[15]

12.     The Supply Agreement contains several provisions addressing a breach or default by SCSC, including non-performance.  Non-performance is defined in the Supply Agreement as including, but not limited to, late delivery of coal to the train, delivery of coal not conforming to the Specifications, breach of any of SCSC's warranties, the failure to deliver all scheduled coal during any month, and any other default or failure of compliance by SCSC with the terms and conditions of the Supply Agreement.  (Supply Agreement, § 14).[16]

13.     The Supply Agreement provides various remedies to RockTenn in the event of SCSC's non-performance or default.  For example, the Supply Agreement allows RockTenn to terminate the Supply Agreement for SCSC's default in certain circumstances.  Alternatively, RockTenn may elect to forego its right to terminate and

---

[15] R. 1-3, at pp. 19-20.

[16] R. 1-3, at p. 23.

instead require SCSC to perform its obligations, and such election is not considered a waiver of the right to terminate.  (Supply Agreement, §§ 7(b), 15).[17]

14.    If SCSC fails to deliver coal to the train in time to meet the established schedules, the Supply Agreement provides RockTenn with the right to obtain coal from another supplier.  In this circumstance, SCSC is liable to RockTenn for the difference in the Supply Agreement price and the replacement coal price. (Supply Agreement, § 7(b)).[18]

15.    Moreover, RockTenn is also entitled to immediately cancel the Supply Agreement, at RockTenn's option, if SCSC fails to deliver coal within the schedule. (Supply Agreement, § 7(b)).[19]

16.    The Supply Agreement allows RockTenn to suspend shipments in addition to RockTenn's other remedies.   Under certain circumstances, RockTenn may immediately suspend shipments when a shipment fails to conform with the Specifications in the Supply Agreement, among other events.  (Supply Agreement, § 19).[20]

---

[17] R. 1-3, at pp. 19, 23.

[18] R. 1-3, at p. 19.

[19] R. 1-3, at p. 19.

[20] R. 1-3, at pp. 24-25.

17.     Along with the suspension rights, RockTenn may demand adequate assurance that SCSC "can and will comply" with the Specifications and other requirements of the Supply Agreement, or otherwise face termination.     (Supply Agreement, § 19(b)).[21]

### C)     SCSC defaults on three of the first four coal shipments

18.     Although the Supply Agreement did not begin until January 1, 2013, the parties agreed to run a "test train" of coal in December 2012.

19.     The test train was timely loaded by SCSC in Kentucky and arrived at the Mill on schedule.   The coal on the test train appeared to be within the Specifications stated in the Supply Agreement.

20.     The next trainload was loaded by SCSC on or about January 20, 2013.   This second trainload was delivered to the Mill in February 2013.

21.     The coal on the second trainload was oversized in six inch chunks rather than the required two inch chunks as stated in the Specifications in the Supply Agreement.

22.     On February 4, 2013, RockTenn notified SCSC of the out-of-spec coal in the January 20 train and provided SCSC with pictures of the oversized chunks.

---

[21] R. 1-3, at pp. 24-25.

23.     On February 5, 2013, SCSC acknowledged that the January 20 trainload of coal was out-of-spec and further responded that SCSC had incorrectly set the parameters on the coal crusher that caused the default.  SCSC assured RockTenn the problem had been corrected and promised that "the February train will not experience any problems."

24.     The next trainload of coal was scheduled to be loaded by SCSC on February 12, 2013.  RockTenn arranged for the CSX train with 100 cars to arrive for the loadout on February 12 as scheduled.

25.     When the train arrived for the February 12 shipment, SCSC told CSX that the mine was down and could not load until February 13.

26.     When CSX had the train ready to load on February 13, SCSC told CSX that it had insufficient coal for that reservation.  Thus, SCSC defaulted under the Supply Agreement by failing to load the February 12, 2013 scheduled shipment.

27.     During this time, SCSC was not communicating to RockTenn about the inability to load the February 12 train.  In fact, RockTenn was having to get all information about the failure to load from CSX.

28.     Finally, on February 14, Steve Sarver from SCSC emailed RockTenn that he had been traveling out of the country and just returned.  He said that there was a mechanical problem at the loadout which was "receiving utmost attention."  He promised

RockTenn that he would notify RockTenn and CSX "shortly" about where to load the next train.

29.    Later on February 14, Mr. Sarver reported to RockTenn that SCSC could not rectify whatever situation was occurring at the loadout location so he requested that RockTenn have CSX place the train at a different location that is not specified in the Supply Agreement.  He claimed that SCSC had "coal stockpiled to load."

30.    On February 15, RockTenn's Jim Tuttle spoke to Mr. Sarver on the telephone about the situation.  Mr. Tuttle told Mr. Sarver that the new relationship with SCSC and bringing coal to the Mill had been a near-disaster.  Mr. Sarver agreed and stated that things were not going well.

31.    The missed February 12 train was rescheduled to February 19 per SCSC's request.  RockTenn arranged for CSX to have a train ready for loading on February 19 at the requested loadout per SCSC's request.

32.    RockTenn then noticed on the CSX website that two persons unknown to RockTenn had put a hold on the February 19 loadout.  RockTenn quickly investigated the situation to find out why its train was not being loaded again.

33.    RockTenn discovered that SCSC had subcontracted the February 19 loadout to another company.  The other company then subcontracted it to another company, Nally & Hamilton.

34.     On information and belief, Nally & Hamilton required full payment from SCSC up front for the 100 train cars of coal.  When SCSC failed to pay Nally & Hamilton prior to the loadout, Nally & Hamilton placed the hold on the loadout.

35.     Nally & Hamilton then asked RockTenn to guarantee the payment. RockTenn wanted to ensure the specifications of the coal and asked Nally & Hamilton to verify several of the specs.  Nally & Hamilton confirmed to RockTenn that the coal it was planning to load on the train for the Mill was not "compliance coal" and would have been out-of-spec under the Supply Agreement which would have been useless to the Mill.

36.     Thus, SCSC defaulted again under the Supply Agreement by failing to load the February 19 train, thereby leaving RockTenn with a dangerously low supply of coal at the Mill.

37.     With SCSC unable to supply coal within spec or on time, RockTenn was forced to obtain coal from another supplier to ensure adequate supply at the Mill. RockTenn found a supplier with coal within the Specifications in the Supply Agreement immediately available on February 21, 2013.

38.     RockTenn arranged for a trainload of coal from the replacement supplier in late February 2013.

39.     Meanwhile, SCSC began making promises again on February 19 to load a train for RockTenn.  Mr. Sarver told RockTenn that "I know the last train and this one

have been delayed.  Going forward we will be punctual.  I know I told Jim [Tuttle] that February would be punctual and I sincerely meant that - but a couple of unforeseen events happened at Jones Fork.  WE WILL BE ON TARGET FOR MARCH." [emphasis original].

40.    Acting as if failing to load a train was insignificant, Mr. Sarver did not contact RockTenn again until an email on February 22, stating that SCSC would load the next train on February 27.  Mr. Sarver thanked RockTenn for its patience and provided no details about the problems SCSC was having loading the trains other than the problems were "unforeseen" and "restricted" the January and February trains.

41.    After SCSC's failure to load a scheduled train, the Supply Agreement provided RockTenn the right to immediately terminate and cancel the Supply Agreement. SCSC's defaults and multiple broken promises caused RockTenn to lose confidence in SCSC to deliver coal for the Mill within spec and on time.

42.    Despite having the right to terminate the Supply Agreement, and despite having lost confidence in SCSC, RockTenn decided in good faith to allow SCSC to present to RockTenn a plan for a cure of the multiple breaches that meets the requirements of Section 15 of the Supply Agreement.[22]

---

[22] R. 1-3, at p. 23.

43.     RockTenn responded on the next business day, February 25, to formally put SCSC on notice of its multiple breaches of the Supply Agreement, including the six inch chunks in the January 20 shipment, and SCSC's failure to load either the February 12 or February 19 trains, despite SCSC's repeated promises and assurances that the February trains would be punctual and contain in-spec coal.   A true and correct copy of RockTenn's February 25, 2013 letter is attached hereto as Exhibit A, and incorporated herein.

44.     RockTenn's February 25 letter also notified SCSC that unless and until SCSC presented a plan for cure that satisfies Section 15 of the Supply Agreement, RockTenn was suspending its purchases of coal from SCSC and would purchase its coal from another source.

45.     SCSC responded on February 25 in a letter that purported to present a plan for cure.   However, the "plan" was the same naked promises made previously by Mr. Sarver that SCSC "stands ready, willing and able to immediately deliver the February train."   A true and correct copy of SCSC's February 25, 2013 letter is attached hereto as Exhibit B, and incorporated herein.

46.     SCSC did not explain why it had twice failed to load the trains or provide any assurances or reasons why it would not happen again, or even that future trains would actually load.

47.     SCSC's February 25, 2013 letter was not an acceptable cure plan to RockTenn.  RockTenn notified SCSC that the supposed cure plan was not acceptable to RockTenn in a letter dated February 26, 2013 to SCSC's in-house counsel, Dustin Deane. A true and correct copy of RockTenn's February 26, 2013 letter to Mr. Deane is attached hereto as Exhibit C, and incorporated herein.

48.     RockTenn's February 26 letter explained that RockTenn had lost confidence in SCSC's ability to supply coal and RockTenn needed to know why SCSC did not have coal available to load the two trains.  RockTenn also asked SCSC to explain why the still-unspecified problems would not interfere with subsequent deliveries for the remaining term of the Supply Agreement.  RockTenn specified that all of this information needed to be part of SCSC's cure plan.

49.     Rather than addressing the questions in RockTenn's February 26 letter, SCSC's Sarver responded on February 28 in a short email that merely stated that the "mining problems we encountered in February have been addressed and corrected." SCSC failed to explain why it lacked coal to load the two February trains, how or why the "problems" were fixed, or provide any insight into how or why the unspecified "problems" would not occur again.

50.     RockTenn responded to Mr. Sarver's cryptic email on March 4, 2013 in an email to SCSC's in-house counsel, Mr. Deane, explaining that Mr. Sarver's email was not

acceptable as a plan to cure.  RockTenn again explained that SCSC would have to respond to the inquiries in RockTenn's February 26 letter before RockTenn could schedule any more shipments of coal from SCSC.

51.    Mr. Deane did not respond to RockTenn's March 4 email.  Instead, Mr. Sarver again emailed RockTenn on March 5, 2013 explaining that SCSC "encountered operational problems" which he said had "been solved."  Mr. Sarver denied that SCSC failed to load the two February trains because it had sold RockTenn's coal to another customer and he said that "the simple and accurate answer for February is Southern Coal experienced some bad luck operationally divorced from any coal sales."

52.    Mr. Sarver concluded his vague explanation for SCSC's failures by stating that SCSC's "forward performance will provide assurances and customer satisfaction." At no time did Mr. Deane, Mr. Sarver, or anyone else from SCSC ever explain to RockTenn what the operational problems and bad luck were, how they were fixed, or how SCSC or RockTenn could be certain that the same or similar/related operational problems and bad luck would not occur again.

53.    On March 6, 2013, RockTenn again asked SCSC if it would provide an explanation about the "problems" and a plan of cure as requested in RockTenn's February 26 letter.  SCSC replied separately through Mr. Sarver and Mr. Deane on March 7, 2013

asserting that SCSC had already provided all the information about the problems and requesting to load a train with coal.

54.    RockTenn responded on March 12, 2013 in a letter to Mr. Deane wherein RockTenn explained why Mr. Sarver's answers failed to inform RockTenn about what the "operational problems" and "bad luck" were, how they were fixed, or how RockTenn or SCSC could know that those problems would not return.   RockTenn explained that without information about why SCSC failed to deliver coal on two occasions in February, RockTenn could not adequately evaluate whether those problems had been truly corrected and RockTenn had no more information about the situation than it did when its trains were not loaded in February.

55.    On March 14, 2013, after SCSC had failed to explain why it failed to load the February trains or provide any other information requested in RockTenn's February 26 letter, RockTenn terminated the Supply Agreement in a letter to Mr. Deane.  A true and correct copy of RockTenn's March 14, 2013 letter is attached hereto as Exhibit D, and incorporated herein.

56.    On March 21, 2013, SCSC's Chief Commercial Officer Tom Lusk wrote to RockTenn objecting to the termination of the Supply Agreement and accusing RockTenn of terminating the Supply Agreement because of his erroneous speculation that RockTenn had found a less expensive supply of coal for the Mill.  A true and correct

copy of Mr. Lusk's March 21, 2013 letter is attached hereto as Exhibit E, and incorporated herein.

57.    Contrary to Mr. Lusk's accusations, the market price for the coal was higher than the Supply Agreement price, so RockTenn was forced to pay more money for replacement coal to supply the Mill.  RockTenn's Senior Vice President - Procurement, Safety and Health, Greg King, responded to Mr. Lusk on March 27, 2013 explaining that RockTenn was required to pay at least $7.00 per ton more than the SCSC price in the Supply Agreement for the replacement coal.   A true and correct copy of Mr. King's March 27, 2013 letter is attached hereto as Exhibit F, and incorporated herein.

58.    After RockTenn's spot purchases of replacement coal in February and March 2013 as a result of SCSC's defaults under the Supply Agreement, RockTenn was able to secure a lower price for the necessary coal for the Mill for the remainder of the term of the terminated SCSC Supply Agreement, although the price was still more than the Supply Agreement price.

59.    Between February 28, 2013 and December 31, 2013, RockTenn's Mill required, and RockTenn purchased, 173,958 shipped tons of coal.

60.    RockTenn had to pay $79.00 per ton for the first two shipments on February 28, 2013 and March 15, 2013, for an aggregate amount of 21,737 tons of coal.  This price

was the best that RockTenn could find for compliance coal within the short time frame created by SCSC's failure to load the two February 2013 trains.

61.     RockTenn was able to negotiate a lower price for the replacement coal for the remainder of 2013 at $77.00 per ton for the remaining 152,221 tons purchased.

62.     For its coal needs during 2013 for the Mill following SCSC's breaches of the Supply Agreement, RockTenn was required to pay $1,087,219.00 more than the contract price under the SCSC Supply Agreement for the same quantity of coal.

63.     RockTenn has incurred damages caused by SCSC's breaches of the Supply Agreement in addition to the higher price of coal paid during the original term of the terminated Supply Agreement.

64.     On November 12, 2014, RockTenn, through counsel, wrote to Mr. Deane demanding payment of the additional price paid by RockTenn for its coal purchases for the Mill in 2013 after SCSC's breaches.

65.     Mr. Deane and SCSC never responded substantively to the November 12, 2014 letter.  Instead, SCSC requested a face-to-face meeting to discuss the issues.

66.     RockTenn agreed to the meeting which was scheduled and then rescheduled for early January 2015.  At 4:17 p.m. on the day before the scheduled meeting, SCSC abruptly cancelled the meeting without providing any reason.

67.    RockTenn would later learn that SCSC had filed suit on the same day that it cancelled the meeting, thereby demonstrating its bad faith and that it never intended to meet with RockTenn.  Instead, SCSC was busy preparing a preemptive lawsuit against RockTenn to forum shop, among other reasons.

## COUNT I - BREACH OF CONTRACT

68.    RockTenn incorporates all of the matters above as if fully set forth herein.

69.    As detailed above, SCSC breached the Supply Agreement in several ways, including its failure to load scheduled trains with coal on at least two occasions in February 2013.

70.    Although RockTenn had the right under the Supply Agreement and the law to immediately terminate the Supply Agreement for SCSC's breaches, RockTenn decided, in good faith, to allow SCSC to submit a plan of cure acceptable to RockTenn, including an explanation of why SCSC did not have coal to load the February 2013 trains, how SCSC had allegedly fixed the problems, and how and why those problems would not occur again during the remaining term of the Supply Agreement.

71.    SCSC failed to submit a plan of cure acceptable to RockTenn.  In fact, SCSC failed to present any plan of cure other than to make additional promises that it would not breach the Supply Agreement again.  SCSC refused to explain what the

"operational problems" or "bad luck" were, how they were fixed, or how or why they would not occur again in the future.

72.    To this day, SCSC has never told RockTenn what the problems were that caused it to fail to load coal on the trains in February 2013 or how those problems were resolved.

73.    RockTenn properly exercised its remedy under the Supply Agreement and law to terminate the Supply Agreement.   Prior to termination, RockTenn properly exercised its remedies under the Supply Agreement and law to suspend shipments and obtain replacement coal.

74.    RockTenn has incurred substantial damages as a result of SCSC's breaches of the Supply Agreement, including without limitation, the purchases of coal at prices in excess of the price that RockTenn was entitled to purchase the coal under the Supply Agreement.

75.    As a result of SCSC's breaches of the Supply Agreement, RockTenn had to pay $1,087,219.00 more for coal than the Supply Agreement price during the original term of the Supply Agreement.   In addition to the higher priced coal, RockTenn has incurred damages caused by SCSC's breach of the Supply Agreement associated with the exercise of RockTenn's remedies, procurement of the replacement coal, and operational inefficiencies caused by SCSC's interruption of RockTenn's coal supply for the Mill.

76. SCSC is liable to RockTenn for its breach of contract in the amount of $1,087,219.00, plus interest, attorney's fees recoverable under the Supply Agreement, at law and/or in equity, plus additional damages caused by SCSC's breaches in an amount to be determined at trial.

## COUNT II - INDEMNIFICATION

77. RockTenn incorporates all of the matters above as if fully set forth herein.

78. Among RockTenn's rights under the Supply Agreement is SCSC's agreement to indemnify RockTenn. The Supply Agreement provides that SCSC "shall defend, indemnify and hold [RockTenn] harmless from and against all liability, loss, claims, demands, damage (including damage to property or bodily injury), and expense (including court costs and reasonable attorneys' fees) arising out of or in any way resulting from [SCSC's] performance or non-performance [under the Supply Agreement] . . . [or] any failure by [SCSC] to comply with the terms [of the Supply Agreement], . . . [or] any breach of this [Supply] Agreement. . . ." (Supply Agreement, § 21).[23]

79. As detailed above, in February 2013, SCSC failed to deliver coal as required under the Supply Agreement on two occasions.

80. In fact, RockTenn learned that SCSC had attempted to load one of RockTenn's February 2013 trains with coal from another supplier which was not in

_____

[23] R. 1-3, at p. 25.

compliance with the Specifications in the Supply Agreement.  It was because the other supplier required SCSC to pay cash in advance for that coal (which SCSC could not or would not do) that the unusable coal was not loaded on the train or delivered to the RockTenn Mill.

81.    SCSC's multiple breaches of the Supply Agreement have caused RockTenn to incur substantial loss, damage, and expense, including court costs and reasonable attorneys' fees, in addition to RockTenn having to purchase its coal supply for the Mill at prices higher than the Supply Agreement price.

82.    Under the indemnification provisions of the Supply Agreement, SCSC is liable to RockTenn for indemnity in an amount sufficient to hold RockTenn harmless from all of its loss, damage, and expense (including court costs and reasonable attorneys' fees) incurred by RockTenn arising out of or in any way resulting from SCSC's performance or non-performance and breaches of the Supply Agreement.

**WHEREFORE,** RockTenn respectfully prays for the following relief:

(a)    that all of SCSC's claims asserted in this action be dismissed with prejudice;

(b)    that the Court award judgment against SCSC and in favor of RockTenn for breach of contract for all damages incurred by RockTenn arising out of SCSC's breaches of the Supply Agreement;

(c)     that the Court award judgment against SCSC and in favor of RockTenn for indemnity in an amount sufficient to hold RockTenn harmless from and against all loss, damage, and expense, including court costs and RockTenn's reasonable attorneys' fees, arising out of or in any way resulting from SCSC's performance or non-performance and breaches of the Supply Agreement; and

(d)     for such other and further relief for RockTenn as this Honorable Court deems just and proper in the circumstances.

Respectfully submitted this 11th day of February, 2015.


/s/C. BISHOP JOHNSON
C. BISHOP JOHNSON
CAWOOD & JOHNSON, PLLC
P.O. Drawer 128
Pineville, Kentucky 40977
Telephone: (606) 337-6500
Fax: (606) 337-6100
E-mail: cbishopjohnson@bellsouth.net

John O'Shea Sullivan
*Pro Hac Vice Application To Be Filed*
Georgia Bar No. 691305
Tala Amirfazli
*Pro Hac Vice Application To Be Filed*
Georgia Bar No. 523890
BURR & FORMAN LLP
171 Seventeenth Street
Suite 1100
Atlanta, Georgia  30363
Telephone: (404) 815-3000

Fax: (404) 817-3244
E-mail: ssullivan@burr.com
E-mail: tamirfazli@burr.com

COUNSEL FOR ROCKTENN CP, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February, 2015, I electronically filed the foregoing **ANSWER AND COUNTERCLAIMS** with the Clerk of Court using the CM/ECF system, which will send notice and a copy of the electronic filing to:

Johnnie L. Turner, Esq.
Johnnie L. Turner, P.S.C.
114 South First Street
P.O. Box 351
Harlan, Kentucky 40831
*Counsel for Plaintiff Southern Coal Sales Corporation*

/s/C. BISHOP JOHNSON
C. BISHOP JOHNSON
CAWOOD & JOHNSON, PLLC
P.O. Drawer 128
Pineville, Kentucky 40977
Telephone: (606) 337-6500
Fax: (606) 337-6100
E-mail: cbishopjohnson@bellsouth.net