UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| SOUTHERN COAL SALES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 6: 15-018-DCR |
| V. | ) ) | |
| ROCKTENN CP, LLC, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case involves a contract dispute regarding the sale of coal. The defendant has moved for summary judgment regarding the plaintiff's claims, as well as its own counterclaims. [Record No. 50] The motion has been fully briefed [Record Nos. 56, 60], and the parties argued the motion during the final pretrial conference held this date. The defendant has also moved *in limine* to exclude the expert testimony of Don Roberts. [Record No. 49]. That motion also has been fully briefed. [Record Nos. 58, 61] For the reasons that follow, the Court will grant the defendant's motion for summary judgment, in part. The defendant's motion *in limine* to exclude expert testimony also will be granted. The issue of damages and attorneys' fees regarding the defendant's counterclaim remains pending.

# I.

Defendant RockTenn CP, LLC, ("RockTenn") operates a paper mill in Fernandina Beach, Florida (the "Mill"). The Mill produces components used to manufacture corrugated boxes. [Record No. 50–6, p. 2] It relies heavily on coal for its energy needs. *Id.* at 2. Due to environmental laws and other concerns, the Mill's coal must meet strict specifications

regarding size, moisture, ash, and sulfur content. *Id.* at 3. Each year, the Mill schedules a period of downtime during which routine maintenance is performed. *Id.* at 2. Ensuring adequate coal supply prior to and after the annual outage is one of the Mill's top priorities. *Id.*

Southern Coal Sales Corporation ("SCSC") markets and sells coal produced by Kentucky Fuel, Sequoia Energy, and other companies. [Record No. 50–2, pp. 2, 6] Kentucky Fuel operates a mine at a location known as Jones Fork, while Sequoia Energy operates the Bardo mine. *Id.* at 6. These entities are owned by Southern Coal Corporation. James "Jay" Justice, III, is the executive vice-president and a principal decision-maker for the company. [Record No. 56–6, pp. 3–4]

In late 2012, RockTenn sought a new coal supplier for the Mill's 2013 requirements. [Record No. 50–6, p. 3] James Tuttle was RockTenn's Director of Chemical and Energy Procurement and was tasked with locating a supplier. *Id.* at 2. On December 23, 2012, RockTenn and SCSC entered into a Coal Supply Agreement whereby SCSC would supply the coal for the Mill's 2013 requirements (the "Agreement"). [Record No. 56–1] Although the terms of the Agreement did not begin until January 1, 2013, RockTenn ordered a "test train" of coal from SCSC in December 2012. *Id.* at 3. The first train under the Agreement was delivered in January 2013. *Id.* RockTenn accepted the January shipment, but complained that the delivery contained six-inch, as opposed to the two-inch, blocks of coal as called for under the Agreement. [*See* Record No. 50–3, p. 34]. The parties dispute the extent to which the January shipment was non-conforming. *See id.* at 34–35.

SCSC shipped only one load of coal to RockTenn in January. [*See* Record No. 56–5, pp. 31–32] Although SCSC was to supply all of RockTenn's coal for 2013, RockTenn had contracted to purchase 190,000 tons of coal from Duke Energy in 2012. *Id.* at 27. RockTenn

had not satisfied that commitment and, therefore, received two final shipments from Duke Energy in early 2013. *Id.* at 25. There is no indication that SCSC had any objection to RockTenn fulfilling its prior contract with Duke Energy.

On January 18, 2013, RockTenn contacted SCSC to schedule a delivery for February 12, 2013. [Record Nos. 50–4, p. 6; 50–6, p. 4] Pursuant to its standard procedure, RockTenn's representative, Jodi Wright, contacted CSX to arrange for 100 empty railcars to arrive at the Jones Fork loadout on February 12, 2013. Wright then contacted Summer Harrison at SCSC and provided the reservation number confirming the arrangement. [Record No. 54–2, p. 101] Harrison sent the schedule to Marc Merritt who operated the Jones Fork mine. [Record No. 50–4, p. 8–9] On January 28, 2013, Merritt e-mailed Harrison and advised her that Jones Fork did not have sufficient "compliance coal" to fulfill RockTenn's February order. [Record No. 54–2, p. 103]

On January 29, 2013, SCSC confirmed with RockTenn that SCSC would load the train on February 12, 2013. *Id.* at 102. Merritt e-mailed Justice on February 11, 2013, advising him that: "We do not have low sulfur coal at Jones Fork for [the] RockTenn train." *Id.* at 114. Merritt requested permission to transport low sulfur coal from another site known as Bevins Branch to Jones Fork to fulfill the order. *Id.* Justice disapproved of the plan, instructing Merritt to ship the coal from Bevins Branch to another customer. *See id.* Justice advised Merritt that the RockTenn order could be filled from the Sequoia mine located at Bardo. *Id.*

On the morning of February 11, 2013, Wright e-mailed Harrison and Steve Sarver, SCSC's Senior Vice-President, to confirm that the next day's loadout was still confirmed. [Record No. 50–3, p. 41] Wright, however, did not receive a response. *See id.* Meanwhile, the 100 empty CSX train cars sat at Jones Fork, as scheduled. *Id.* at 42. The same day, Merritt

informed Harrison of Justice's plan to perform the loadout at Bardo rather than Jones Fork. [Record No. 54–2, p. 117] No one at SCSC made any efforts to have the train cars moved to Bardo or to inform RockTenn so that it could attempt to have the train cars moved. [*See* Record No. 50–4, p. 16–17]

Wright followed-up with Sarver and Harrison again on the morning of February 12, 2013, but received no response. [Record No. 54–3, p. 57] On February 13, 2013, Tuttle and Wright separately reached out to Sarver and Harrison, seeking the status of the February 12, 2013 shipment. [Record No. 54–3, pp. 58–59] Tuttle attempted to contact Justice directly but was unsuccessful. [Record No. 54–2 at p. 122] Finally, on February 14, 2013, Sarver contacted Wright by e-mail, telling her that he had been out of the country and that SCSC had been unable to load the coal due to a mechanical problem at the Jones Fork loadout.[1] *Id.* at 124. Later that day, Sarver advised RockTenn that the unspecified mechanical problem had an "indefinite time line," but SCSC was ready to provide coal from a loadout known as Balkan.[2] *Id.* RockTenn agreed and coordinated with CSX to reschedule the shipment from Balkan. [Record No. 54–3, p. 61] SCSC accepted the reservation. *Id.*

On February 15, 2013, Sarver notified Wright that SCSC would load coal at Balkan later that night. *Id.* at 132. Apparently through no fault of either party, the CSX train did not arrive at Balkan for the loadout. No one from SCSC contacted RockTenn. *Id.* at p. 60. Tuttle

---

[1] Sarver offered no explanation during his deposition for his failure to respond, other than suggesting it was Harrison's responsibility and that he had visited Florida. [Record No. 50–3, p. 41, 45–46] Harrison did not respond because she felt that Sarver was "handling the situation." [Record No. 50–4 at p. 18]

[2] SCSC did not own the Balkan loadout. During his deposition, Sarver stated that he did not know who owned it. [Record No. 54–2, p. 55] Sarver set-up the arrangement to load there through mutual friend. Ultimately, the plan fell through. [Resp. Br., p. 14]

again attempted to contact Justice regarding the lack of communication, asking "Is anyone from Southern Coal going to call me today?" [Record No. 54–2, p. 138] Justice replied that the lack of communication was not acceptable and would be corrected. *Id.* Sarver followed-up with a phone call to Tuttle after the exchange with Justice. *Id.* at pp. 62–63.

RockTenn arranged for CSX to send a train to Balkan on February 19, 2013. *Id.* at 65. Wright e-mailed Sarver on the morning of February 18, 2013, to confirm that the coal would be loaded as scheduled. [Record No. 54–2, p. 140] Wright stressed that RockTenn needed coal to keep the Mill running before the annual outage commenced. *Id.* Sarver assured her that he would be "working on the train loading for today/tonight." *Id.* at 141. Upon reviewing CSX's online customer portal, however, Tuttle discovered that RockTenn's February 19, 2013 train had been canceled by Nally & Hamilton. [Record No. 56–2, p. 32] Tuttle then contacted Leo Hamilton (one of the owners of Nally & Hamilton) who informed Tuttle that Nally & Hamilton owned the Balkan loadout. *Id.* Hamilton purportedly relayed that his company canceled the CSX train due to SCSC's failure to pay in advance for the loadout. *Id.* SCSC disputes this assertion. Regardless, the train was not loaded and RockTenn received no response from SCSC until February 22, 2013, when Sarver reported that SCSC had been unable to load coal from the Balkan loadout. [Record Nos. 50–3, p. 71; 54–2, p. 143] Sarver did not provide an explanation, but thanked Wright for her patience and stated that "the problems at Jones Fork were unforeseen." *Id.* He concluded by stating that SCSC would load a March train from Bardo. *Id.*

By letter dated February 25, 2013, RockTenn formally notified SCSC of its breaches of the Agreement, including its failures to load the February 12, 2013, and February 19, 2013, trains. [Record No. 60–3]. The letter also notified SCSC that, unless and until it presented a

plan for cure, RockTenn was suspending its purchases and would obtain its coal from another source. *Id.* SCSC's response provided that it stood "ready, willing and able to immediately deliver the February train" and requested to load coal from the Bardo facility that week. [Record No. 54–1, p. 99] Notably, SCSC did not explain why it had failed to load the previous trains or provide any specific assurances that additional breaches would not occur in the future.

On February 26, 2013, RockTenn notified SCSC that, to the extent the response was intended to be a cure plan, it was not acceptable. [Record No. 54–1, p. 101] RockTenn further explained that it had lost confidence in SCSC's ability to timely supply coal and, for RockTenn to agree to continue purchasing coal, it needed to know why SCSC was unable to fulfill the last two shipments. *Id.* at p. 102. The letter also informed SCSC that, because RockTenn's coal supply had dipped to a dangerously low level, it had been forced to purchase coal from a different supplier. *Id.* at p. 101. RockTenn explained that this was a temporary decision while RockTenn decided whether to accept SCSC's plan of cure. *Id.* On February 28, 2013, Sarver responded to RockTenn's request in a brief e-mail to Tuttle, stating simply that the mining problems encountered in February had been addressed and corrected. *Id.* at p. 104.

On March 4, 2013, RockTenn responded through its in-house counsel that Sarver's e-mail was not an acceptable cure plan. *Id.* at p. 107. RockTenn reiterated that SCSC would have to respond to its inquiries before any additional shipments of coal would be scheduled. *Id.* Sarver responded to the e-mail the following day, providing further vague excuses as to why SCSC defaulted on the February shipments. *Id.* at p. 112. On March 6, 2013, RockTenn e-mailed SCSC's in-house counsel, asking whether Sarver's prior e-mail was SCSC's formal response to RockTenn's default letter. *Id.* at p. 115. Sarver replied, asserting that SCSC had already provided all information and requesting to load a train with coal. *Id.* at p. 117.

Additionally, Dustin Deane, SCSC's in-house counsel, offered to schedule a site visit. *Id.* at p. 122.

RockTenn terminated the Agreement by letter to Deane dated March 14, 2013. *Id.* at pp. 125–26. A week later, SCSC's Chief Commercial Officer, Tom Lusk, wrote to RockTenn objecting to the termination. *Id.* at 128. Lusk speculated that RockTenn had located a preferable coal supplier and wished to avoid its obligations under the contract. *Id.* RockTenn's Senior Vice President of Procurement, Safety, and Health, Greg King, responded to Lusk on March 27, 2013, advising him that RockTenn was required to pay at least $7.00 more per ton for replacement coal than the contract price of $71.00 per ton. *Id.* at pp. 131–32. RockTenn alleges that, between February 28, 2013, and December 31, 2013, it purchased 190,003 shipped tons of coal from suppliers other than SCSC. [Record No. 50–6, p. 11] When RockTenn demanded the additional price it paid for replacement coal, SCSC filed this action claiming breach of contract and seeking a declaratory judgment regarding the parties' rights and obligations under the Agreement. [Record No. 1–3] RockTenn has filed similar counterclaims [Record No. 4] and has moved for summary judgment. [Record No. 50]

## II.

Summary judgment is appropriate "if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In deciding whether to grant a motion for summary judgment, the Court views all

facts and draws all inferences from the evidence in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 587 (1986).

## III.

### A.    Breach of Contract

The valid contractual choice-of-law clause provides that Virginia law will apply. *See Wallace Hardware Co. Inc. v. Abrams*, 223 F.3d 382, 397 (6th Cir. 2000). Under Virginia law, contract terms are to be construed according to their plain meanings. *See Foreign Mission Bd. of Southern Baptist Convention v. Wade*, 409 S.E.2d 144, 146 (Va. 1991). If the terms are clear and unambiguous, it is the court's duty to enforce them. *Id.* Here, Paragraph 15 of the Agreement provides:

> Buyer may terminate this Agreement for default if, after Buyer has given written notice of the particulars of the default, Seller has failed to cure the same within fifteen (15) days of receipt of the notice or, if the default is not capable of being cured within such time, Seller has not within such 15-day period commenced action to cure promptly after receipt of notice and presented to Buyer a plan for cure acceptable to Buyer.

Paragraph 14 of the Agreement defines late delivery of coal or failure to deliver all scheduled coal during any month as nonperformance under the contract. [Record No. 56–1, p. 8]

E-mail exchanges between Wright and Harrison plainly reflect the parties' agreement that SCSC would ship coal to RockTenn on February 12 and 19, 2013. [Record Nos. 54–2, p. 102; 140–41] It also is undisputed that the shipments did not occur. This constitutes nonperformance under Paragraph 14 of the Agreement.[3] The parties agree that RockTenn

---

[3] Under Paragraph 7(b) of the Agreement, SCSC contends it had until the last day of February to make the shipments. However, this clause is not applicable, as it applies only "[i]n the event that the parties do not agree on a mutually acceptable delivery schedule."

provided SCSC written notice of the particulars of these defaults on February 25, 2013. [Record No. 56–9]

### 1.     RockTenn's Ability to Enforce the Agreement

SCSC contends that RockTenn may not enforce the Agreement because RockTenn was the first to breach. [Resp. Br. p. 22] It is generally true that the first party to breach a contract may not enforce the contract against another party. *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997). However, an exception arises when the breach at issue is not material and, therefore, does not go to the "root of the contract." *Id.*

Paragraph 7(b) of the Coal Supply Agreement provides: "Buyer will advise Seller on or before the 15th day of each calendar month preceding scheduled Shipments of the number of Shipments it desires to load during the succeeding calendar month. . . ." SCSC alleges that RockTenn breached the contract when it advised SCSC on January 18, 2013, regarding its order for February 12, 2013. There is no indication, however, that RockTenn's delay of three days was material. When Wright e-mailed Harrison concerning the shipment on January 18, 2013, no one from SCSC gave any indication that RockTenn had not provided enough time for SCSC to fulfill the order. Further, Sarver testified that it would take three or four days, "at the most" to mine the 10,000 tons of coal needed to complete RockTenn's February 12, 2013 shipment. [Record No. 50–3, p. 33]

Alternatively, SCSC contends that, pursuant to Paragraph 7(b), RockTenn had a duty to accept a February shipment on or before the last day of the month. [Resp. Br. p. 24] By February 25, 2013, however, SCSC had breached the Agreement and RockTenn had issued formal notice of default. Under Paragraph 7(d), RockTenn was entitled to obtain coal from an alternative source.

SCSC also contends that RockTenn breached the Agreement by ordering only one shipment of coal in February (and planning to order only one in March). [Resp. Br., p. 22] Paragraph 4 of the Agreement provided that RockTenn would purchase coal "estimated at 228,000 tons during the term of this Agreement. Seller understands the estimated quantity is subject to change based on Buyer's individual operating circumstances and as such Buyer shall not be obligated to purchase any specific quantity of coal herein whatsoever." [Record No. 56–1, p. 3] RockTenn explained that it only needed one delivery in February 2013 because the annual shutdown was scheduled for March. Under the plain language of the Agreement, RockTenn was not obligated to accept two loads per month.

Additionally, SCSC argues that RockTenn breached the Agreement when it accepted shipments of coal from Arch on two occasions in early 2013. Clearly, the buying and selling of coal goes to the root of the contract. However, there is nothing to indicate that SCSC did not acquiesce in this deviation from the Agreement. Tuttle testified that he "ran it by" Sarver and "[Sarver] said it was fine." [Record No. 56–2, p. 40] On January 2, 2013, Wright e-mailed Harrison, Sarver, and others at SCSC, explaining RockTenn's requested schedule to complete the commitment with Duke Energy. [Record No. 56–5, p. 31] Sarver responded the same day, advising Wright the adjustment was acceptable. *Id.* Regardless, any alleged breaches based on the shipments from Duke Energy or the single loads for February/March were waived based on SCSC's subsequent acquiescence. *See Dziarnowski v. Dziarnowski*, 418 S.E.2d 724, 726 (Va. Ct. App. 1992).

Finally, SCSC contends it had a right to rely on the parties' prior conduct as well as industry norms in construing the shipment provisions of the Agreement.[4] [Resp. Br., p. 24] A course of performance between contracting parties may demonstrate a mutual intent to modify the terms of a contract under certain circumstances. *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983). Because the parties' relationship was very new, it is unlikely that a course of performance had been established. *See* Va. Code Ann. § 8.1A–303 ("Course of performance" is a "sequence of conduct" involving repeated occasions for performance by a party.) Further, the plaintiff has shown no instances in which trains went unloaded and e-mails unanswered for days, with RockTenn accepting the performance or acquiescing without objection. *See id.* The Court acknowledges that SCSC showed flexibility with respect to scheduling RockTenn's January 2013 shipment, but that does not change the fact of SCSC's breach in February 2013.

## 2. Opportunity to Cure

RockTenn advised SCSC that, based on its performance, it had lost confidence that SCSC would actually have sufficient coal to load a future train. While RockTenn doubted a cure was possible, it gave SCSC an opportunity to present a plan for cure meeting the requirements of Paragraph 15 of the Agreement. After receiving an unsatisfactory response from SCSC, RockTenn reiterated the need for a cure plan on February 26, 2013. [Record No. 54–1, p. 109] Specifically, it stated:

> In order for RockTenn to continue purchasing coal from Southern Coal, as part
> of its assessment of a proposed plan to cure, RockTenn needs to know why
> Southern Coal did not have coal available to load each of these last two trains.

---

[4] SCSC did not provide any evidence or argument regarding industry norms. Thus, the issue does not warrant further discussion. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (Issues raised in a perfunctory manner are deemed waived.)

> If Southern Coal was unable to produce and deliver enough coal for these trains, we need to know the reasons why. If Southern Coal had available coal and delivered the coal to other customers, we need to know that and why Southern Coal preferred those other customers. . . . Southern Coal needs to explain to— and convince—RockTenn why these and other problems will not interfere with subsequent deliveries for the remainder of the term of the [Agreement]. All of this information needs to be a part of Southern Coal's plan to cure.

*Id.* at 110.

On February 28, 2013, Sarver e-mailed Tuttle, stating simply, "[t]he mining problems we encountered in February have been addressed and corrected." *Id.* at 104. When pressed for more responsive answers, Sarver stated the following in a March 5, 2013 e-mail to RockTenn's in-house counsel:

> Commercially, please understand that Southern Coal encountered operational problems that delayed the RockTenn train loading. These operational problems have been solved. In fact, Southern Coal stood ready and able to load the February RockTenn train during the last week of the month. Southern Coal DID NOT load the February RockTenn coal for another customer. . . . In short, the simple and accurate answer for February is Southern Coal experienced some bad luck operationally divorced from any coal sales. We can only move forward and give substantive insurances (sic) by loading the March train on time and in spec. Our forward performance will provide assurance and customer satisfaction.

*Id.* at 112. On March 14, 2013, RockTenn sent SCSC a termination letter, explaining that Sarver's vague and generalized explanations were insufficient and did not allow RockTenn to evaluate SCSC's ability to perform going forward. *Id.* at 125–26.

SCSC contends that RockTenn is not entitled to summary judgment because it did not allow SCSC a reasonable opportunity to cure under Paragraph 15 of the Agreement. [Resp. Br., p. 24] The crux of its argument is simple: RockTenn had no intention of approving any cure plan that SCSC tendered. The record indicates that Tuttle, understandably, was weary of SCSC's failure to deliver coal and lack of communication. During his deposition, Tuttle

testified that, after the events of February 19, 2013, he felt he "could no longer rely on Southern Coal." [Tuttle Depo, p. 262]   As early as February 20, 2013, Tuttle was shopping for a new long-term coal supplier.  [Record No. 56–3, p. 10]   On February 21, 2013, Tuttle advised Wright that Arch Minerals would be RockTenn's new supplier and that SCSC was "history." *Id.* at p. 22.  SCSC does not contend that it was aware of any of Tuttle's comments or conduct at the time, however.  Yet, it still failed to present a plan of cure that was acceptable to RockTenn—or any plan of cure at all, for that matter.

It is no surprise that, as the drafter of the contract, the plan-of-cure provision favors RockTenn.  [See Record No. 50–3, p. 3]  Regardless, there is no suggestion that the Agreement is the product of anything other than arms-length negotiations between two sophisticated parties, both of whom were represented by counsel.  *See First Nat'l Exchange Bank v. Johnson*, 355 S.E.2d 326, 330 (Va. 1987).   If SCSC objected to this provision, it could have chosen not to sign the Agreement.  *See Wells v. Entre Comp. Centers, Inc.*, 915 F.2d 1566, *6 (4th Cir. 1990) (table).  What occurred following SCSC's breach is a bargained-for result.  *See Johnson*, 355 S.E.2d at 330.

A duty of good faith and fair dealing in inherent in every commercial contract.  Va. Code Ann. § 8.1A–304.  However, this implied duty cannot act as a substitute for terms of a contract.  *See Morrison v. Wells Fargo Bank, N.A.*, 30 F.Supp.3d 449, 456 (E.D. Va. 2014). Since the plaintiff's claims pertain to the defendant's exercise of its express contractual right to terminate the contract, the plaintiff has not stated a claim for breach of the implied covenant of good faith and fair dealing.  *See id.*

Having determined that SCSC is liable to RockTenn for breach of contract, the Court turns to damages.

## B.    Damages

### 1.    RockTenn's Procurement of Substitute Coal

Following SCSC's breach, RockTenn was entitled to "cover" by making, in good faith and without reasonable delay, any reasonable purchase of or contract to purchase substitute goods.  Va. Code Ann. § 8.2–712.  Accordingly, RockTenn is entitled to recover from SCSC "the difference between the cost of cover and the contract price, together with any incidental or consequential damages."  *Id.*

The price for "compliance coal" under the Agreement was $71.00 per ton.  [Record No. 56–1, p. 5]  Following SCSC's breach, Tuttle found a supplier with coal "meeting or exceeding the Specifications in the Supply Agreement" immediately available.  [Record No. 50–6, p. 10]  A load was purchased in late February 2013 for $79.00 per ton.  In March, RockTenn purchased two loads for $80.00 and $83.00 per ton, respectively.  *Id.* at 11. Tuttle testified that these were the best prices he could find, given the short time frame.  *Id.*  Aside from a small shipment in November (which cost $80.00 per ton) the remainder of the 2013 coal cost $77.00 per ton.  *Id.*  Ultimately, RockTenn paid $1,276,299.00 more for coal than it would have under the Agreement with SCSC.[5]  *Id.* at 13.

While RockTenn contends that it did not intentionally overpay to increase damages, it does not dispute that the replacement coal was of a higher quality than the coal it would have received under the Agreement.  Additionally, there is no evidence that coal with specifications similar to those under the Agreement could not be located.  The record confirms that the

---

[5] RockTenn claimed damages in the amount of $1,087,219.00 in its counterclaim and responses to discovery requests.

specifications under RockTenn's new contract with Arch Coal exceeded those under the Agreement with SCSC.[6]  Lusk, SCSC's Chief Commercial Officer, testified that these differences in quality would have created an $8.00 difference in value.  RockTenn points out that SCSC has not presented any evidence "that any supplier had coal in the exact specs in the SCSC contract, or that RockTenn decided not to purchase the exact specs, or that the Arch price was above market . . . ."  [Reply Br., p. 14]  While SCSC has not presented evidence on these matters, RockTenn has moved for summary judgment and has the burden of showing that no genuine issue of fact exists.

Under Virginia law, the measure of damages for breach of contract "is the sum that would put [RockTenn] in the same position, as far as money can do, as if the contract had been performed."  *Estate of Taylor v. Flair Property Assocs.*, 448 S.E.2d 413, 414 (Va. 1994).  Accordingly, RockTenn is entitled to recover amounts used to purchase "substitute," not better and more expensive goods.  *See* Va. Code Ann. § 8.2–712.  Although cover goods need not be identical, a buyer may not use the concept of "cover" to put himself in a better position that he would have been had the contract been performed.  *Martella v. Woods*, 715 F.2d 410, 413 (8th Cir. 1983).  *See also Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1070 (N.J. 1988) (internal citation omitted) (Cover damages may be denied when "the seller comes forward with persuasive evidence that the buyer will reap added profits because of the superior quality of the cover merchandise.").

---

[6] Arch's coal had to be at least 12,700 BTUs, while SCSC's coal was at least 12,500.  The standard ash content under the Arch contract was 8 percent, but 10 percent under the SCSC Agreement.  Standard moisture content for the Arch coal was 6.5 percent, while it was 8 percent for SCSC.

Accordingly, significant questions remain regarding the reasonableness of RockTenn's substitute coal. Recovery of costs for a superior product depends, in part, on evidence indicating that a more comparable substitute was not available. *See Freitag v. Bill Swad Datsun*, 443 N.E.2d 988, 991 (1981). *See also Mueller v. McGill*, 870 S.W.2d 673, 675–76 (Tx. Ct. App. 1994). RockTenn suggests it was forced to make a decision quickly because of SCSC's default. It is unclear, however, how SCSC's breach caused RockTenn to enter into a long-term contract, under which it would pay significantly higher prices for the remainder of the year.

### 2. Indemnification

Paragraph 21 of the Agreement provides:

> To the fullest extent permitted by law, Seller shall defend, indemnify and hold Buyer . . . harmless from and against all liability, loss, claims, demands, damage . . ., and expense (including court costs and reasonable attorneys' fees) arising out of or in any way resulting from Seller's performance or non-performance hereunder, including . . . any breach of this Agreement.

In Count II of its Counterclaim, RockTenn demands indemnification for all loss, damage, and expense (including court costs and reasonable attorneys' fees) under the Agreement. [Record No. 4, p. 35] SCSC claims that this provision is intended to compensate RockTenn only if sued by a third party. This argument is unpersuasive. As previously stated, contractual language will be construed according to its plain meaning and indemnity provisions are no different. *See Breton, LLC v. Lincoln Nat. Life Ins. Co.*, 805 F.Supp.2d 251, 266 (E.D. Va. 2011). Under Virginia law, indemnification clauses do not limit the award of attorneys' fees to third-party litigation. *See Potomac Tel. Co. of Va. V. Sisson & Ryan, Inc.*, 362 S.E.2d 723, 728–29 (Va. 1987). *See also Am. Sales Corp. v. Adventure Travel, Inc.*, 867 F.Supp. 378, 380 (E.D. Va. 1994).

The parties dispute whether RockTenn properly disclosed a computation of the attorneys' fees sought in providing initial disclosures under Federal Rule of Civil Procedure 26. The initial disclosures, served on April 15, 2015, listed "an amount sufficient to hold RockTenn harmless for all of its loss, damage, and expense (including court costs and reasonable attorneys' fees)." [Record No. 56–11] In answers to interrogatories, provided September 30, 2015, RockTenn still did not provide a calculation with respect to attorneys' fees. [Record No. 56–12] On November 5, 2015, RockTenn's attorney proposed that RockTenn would make a proffer at trial regarding attorneys' fees and litigation costs. [Record No. 60–5] Cross-examination of RockTenn witnesses regarding attorneys' fees was also discussed. *Id.* There is no indication that SCSC or its counsel responded at that time.

Because the computation of attorneys' fees was constantly changing, it is likely that RockTenn's disclosure of the information would have been of limited value to SCSC. Further, RockTenn disclosed the basis of the each category of damages sought and there is no suggestion that SCSC was unfairly surprised. Although RockTenn did not disclose the computation of attorneys' fees in its Rule 26 disclosures, its failure to do so was harmless in this case. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii); Fed. R. Civ. P. 37(c)(1).

Accompanying RockTenn's motion for summary judgment is the declaration of John O'Shea Sullivan, counsel for RockTenn. Sullivan has provided a breakdown of the work performed by individuals at his firm along with their billing rates to produce a fee total of $189,768.50 and $9,982.64 in expenses, as of November 30, 2015. [Record No. 50–7, p. 3] SCSC contends that Sullivan's declaration does not adequately describe the services performed and that the hourly rates charged are inappropriate. [Resp. Br., p. 34]

A party requesting attorneys' fees is entitled to bill only the hours "reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Further, attorneys must "maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended." *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 553 (6th Cir. 2008). Documentation offered in support of attorneys' fees must be "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Id.* Sullivan's affidavit sets out a month-by-month account of how many hours each attorney spent working on this case and which matters the attorney was addressing. [Record No. 50–7] SCSC makes no specific objections but, contends that Sullivan provides "no details."

While counsel need not "record in great detail each minute he or she spent on an item," the general subject matter must be identified. *Imwalle*, 515 F.3d at 553 (citations omitted). Further, there is concern regarding an extensive award of fees when the Court has not had the opportunity to review billing entries. *See e.g., Laney v. Getty*, No. 5: 12-cv-306-DCR, 2014 WL 5167528, *4 (E.D. Ky. Oct. 14, 2014).

RockTenn has asserted its attorney-client privilege and has not filed the billing records in this case. [Record No. 60, p. 16] Generally, however, the attorney-client privilege does not extend to billing records. *Humphreys, Hutcheson and Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985). Invoices that "reveal the motive of the client in seeking representation, litigation strategy or the specific nature of the services provided are privileged." *Evenflo Co., Inc. v. Hantec Agents Ltd.*, No. 3: 05-cv-346, 2006 WL 2945440, at *4 (S.D. Ohio Oct. 13, 2006) (quoting *Chaundhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999)). RockTenn has offered to provide its billing invoices to the Court for *in camera* review. [Record No. 60, p.

16] SCSC also is entitled to review the more detailed information, however. If RockTenn wishes to pursue attorneys' fees, it will be required to file redacted billing statements and make a separate motion for fees under Joint Local Rule of Civil Practice 54.4

### IV. RockTenn's Motion to Exclude Expert Testimony of Don Roberts

Roberts is a civil engineer who has worked in the coal industry for over 30 years and has performed coal reserve and mineability analyses on a regular basis. [*See* Record No. 58–1, pp. 9–14] Roberts' purported testimony is that SCSC had sufficient compliant coal to satisfy the Agreement with RockTenn for the duration of the Agreement. *Id.* at 20. This testimony is not relevant to any remaining issues in this case. *See* Fed. R. Evid. 401; 702. Regardless of whether SCSC was able to satisfy the Agreement, SCSC failed to make adequate assurances to RockTenn under an acceptable cure plan, as required by the Agreement. And because SCSC breached the Agreement and is not entitled to damages, the amount or value of its coal reserves is not relevant in that regard. *See* Fed. R. Evid. 401.

SCSC proposes that Roberts will testify regarding the quality of the substitute coal RockTenn purchased from Arch. RockTenn provided SCSC with its Arch Coal contract on September 30, 2015, after Roberts had tendered his report under Rule 26(a)(2)(B). During his deposition, however, Roberts testified that he did not rely on the Arch contract in producing his supplemental report under Rule 26(a)(2)(E). Although Roberts testified that the coal under the Arch had higher specifications than the SCSC coal, he was unsure whether he was prepared to testify on the topic. [Record No. 58–1, p. 81] When questioned, Roberts responded: "I'm just familiar with [the contracts]. . . . I did take a look at them." *Id.* at 79.

Roberts' report also contains information regarding the market prices for coal in 2013. Roberts testified that market prices were "in his report" but that he just included them to show

information he had regarding a market price for that area at that time. *See id.* at 20. Further, the information did not differentiate between different types of coal—it only accounted for whether the coal came from a surface or underground mine. *Id.* at 27–28. SCSC did not respond to RockTenn's argument regarding Roberts' testimony as to market prices.

SCSC has not demonstrated that Roberts' purported testimony regarding market prices for coal in 2013 is relevant. While market prices for compliance coal may be relevant to RockTenn's damages, there is no indication that general information regarding coal prices will assist the trier of fact. *See* Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008).

## V.

Based on the foregoing, summary judgment will be granted in favor of RockTenn on SCSC's breach of contract claim. With respect to RockTenn's counterclaim, the issue of whether the Arch coal was a reasonable substitute remains unresolved. Va. Code Ann. § 8.2–712. Although the Court will grant summary judgment in favor of RockTenn regarding its entitlement to attorneys' fees under the Agreement's indemnity provision, the amount will be determined at the conclusion of this action in accordance with this opinion and Joint Local Rule of Civil Practice 54.4. Accordingly, it is hereby

**ORDERED** as follows:

1.      Defendant RockTenn CP, LLC's motion *in limine* to exclude expert testimony [Record No. 49] is **GRANTED**.

2.      Defendant RockTenn CP, LLC's motion for summary judgment [Record No. 50] is **GRANTED**, in part, and **DENIED**, in part. Summary judgment is granted in favor of RockTenn with respect to SCSC's claims. Summary Judgment is granted in favor of

RockTenn, in part, with respect to its counterclaims against SCSC, consistent with this Memorandum Opinion and Order.

3. An additional pre-trial conference shall be held in this matter on **Tuesday, November 1, 2016**, beginning at the hour of **1:30 p.m.**, at the United States Courthouse in **LEXINGTON**, Kentucky.

This 6th day of September, 2016.

Signed By:

*Danny C. Reeves*   DCR

**United States District Judge**